## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
ENERGY POLICY ADVOCATES,                )
                                        )
            Plaintiff,                  )
                                        )
        v.                              )
                                        )        Civil Action No. 22-0298 (TJK)
UNITED STATES ENVIRONMENTAL             )
PROTECTION AGENCY,                      )
                                        )
            Defendant.                  )
_____ )

## DECLARATION OF JOHN SHOAFF

I, John Shoaff, declare that the following statements are true and correct:

1. Since April 2018, I have served as the Director of the Office of Air Policy and Program

   Support ("OAPPS") within the Office of Air and Radiation ("OAR"), in the United States

   Environmental Protection Agency ("EPA" or "Agency"). OAR's principal function is to

   implement the Clean Air Act. OAR develops national programs, policies, and

   regulations for controlling air pollution and radiation exposure. The central

   responsibilities of the OAPPS includes overseeing the processing of OAR's Freedom of

   Information Act ("FOIA") requests; coordinating OAR regulatory packages,

   Congressional requests, and correspondence; managing a Federal Advisory Committee;

   and working on a handful of cross-cutting issues, such as environmental justice,

   economics, research, science policy and international issues.  Prior to serving as Director

   of OAPPS, I was the OAPPS Policy Group Leader for approximately three and half years

   from December 2014 to April 2018. Before joining OAR, I worked in various roles in

EPA's Office of Chemical Safety and Pollution Prevention 22 years. I first started working for the Agency in 1993.

2.  The statements I make in this Declaration are made based on my personal knowledge, upon information acquired by me from staff and colleagues through the performance of my official duties, and upon conclusions reached and determinations made based on that information.

3.  I have read and am personally familiar with Energy Policy Advocates' ("Plaintiff") September 28, 2021, FOIA request identified by the Agency as request number EPA-2021-006794.  As the Director of OAPPS, I supervised staff members responsible for responding to this request. The basis for each of the Agency's FOIA withholdings is described in the *Vaughn* index, updated January 27, 2023, which is attached to this Declaration. *See* Exhibit A. The purpose of this Declaration is to explain the basis for the Agency's withholdings and support the Agency's Motion for Summary Judgment.[1]

### PLAINTIFF'S SEPTEMBER 28, 2021, FOIA REQUEST

4.  *Plaintiff's FOIA Request EPA-2021-006794.* On September 28, 2021, Plaintiff submitted a FOIA request using the Agency's FOIAonline website[2] seeking the following records:

    all electronic correspondence, whether email, text, SMS, etc., and any accompanying information, including also any attachments, a) sent to or from or which copies (whether as cc: or bcc:) i) Campbell.Ann@epa.gov and/or ii) rakosnik.delaney@epa.gov, that b) was also sent to or from or which copies (again, whether as cc: or bcc:) or mentions, anywhere, National Climate Advisor Gina McCarthy (including "Gina" and/or "McCarthy"), that also c) includes, anywhere, the following terms: i) "CO2", ii) "NAAQS", iii) "GHG" (including in

---

[1] Plaintiff has indicated it is limiting its challenge to EPA's withholdings on pages. 3, 5-11 of an eleven-page PowerPoint presentation dated February 4, 2021 (*Bates Stamp* ED_006414_00000550-0001 through ED_006414_00000550-0011). Therefore, this Declaration only addresses the Agency's withholdings identified by Plaintiff as subject to challenge in this litigation.

[2] *Get the FOIA Information You Need From One Place,* FOIAonline, https://foiaonline.gov/foiaonline/action/public/home (last accessed Jan. 19, 2023)

"GHGs"), and/or iv) "Paris", and d) is dated January 21, 2021 through the date
you process this request, inclusive.

Plaintiff's FOIA request, which the Agency assigned tracking number EPA-2021-

006794, is attached as Exhibit B.

5. *The Agency's Search for Records*. Plaintiff's FOIA request provided the relevant search

criteria, including the date range, electronic search terms, and custodians. Using the

provided search criteria, EPA conducted an initial centralized email search of the

identified custodians' Agency email accounts in January 2021. EPA also confirmed that

the Agency did not possess any responsive text messages. I understand that Plaintiff is

not challenging EPA's search for records in this litigation.

## THE AGENCY'S PRODUCTION OF RECORDS

6. *The Agency's Production of Records*. On January 18, 2022, OAR employee Sabrina

Hamilton, Air and Radiation Liaison Specialist and FOIA Coordinator, Office of Air and

Radiation, sent a letter through FOIA online to the Plaintiff's counsel, Mr. Matthew D.

Hardin, indicating that, due to unusual circumstances, OAR required additional time to

complete its response to Plaintiff's FOIA request. Ms. Hamilton's letter is attached as

Exhibit C.

7. Consistent with Ms. Hamilton's January 18, 2022 letter, the Agency completed its

response to Plaintiff's FOIA request on March 31, 2022 and produced a total of three

documents.

8. The first document (*Bates Stamp* ED_006414_00000549-00001) is an email transmitted

on February 4, 2021, between several EPA employees with the subject line of "WH

Power Plant Briefing." This document was released in full.

9. The second document (*Bates Stamp* ED_006414_00000550-0001 through

ED_006414_00000550-0011) is a PowerPoint presentation entitled "Power Sector Strategy: Climate, Public Health, Environmental Justice: The Building Blocks." The Power Point was created by Joe Goffman, then-Principal Deputy Assistant Administrator of EPA's Office of Air and Radiation, among other Agency employees, for a February 4, 2021, briefing by Joe Goffman with Gina McCarthy and Ali Zaidi, then National Climate Advisor and Deputy National Climate Advisor, respectively, in the White House Office of Domestic Climate Policy. Other meeting invitees included EPA Chief of Staff Dan Utech and Office of Domestic Policy employee Maggie Thomas. The purpose of this meeting was to brief the White House on potential policies and strategies under consideration by Agency decision-makers for regulating power plant pollution, and to provide the White House with an opportunity to share questions and comments on the Agency's potential regulatory strategies for the power sector.

10. The Agency withheld certain portions of the February 4, 2021, PowerPoint presentation from Plaintiff pursuant to the deliberative process privilege of Exemption 5 of the FOIA.

11. The third document in the Agency's March 31, 2022, production (*Bates Stamp* ED_006414_00000562-00001 through ED_006414_00000562-00004) is a four-page email chain between several employees of the Executive Branch and certain outside parties. The only information withheld from the third document is one email address that was withheld under Exemption 6 in three different places in this email chain. All other information in this email chain was released.

12. After the Agency's March 31, 2022, document production, it is my understanding that Mr. Hardin, on behalf of Plaintiff, began discussions with the United States Department of Justice regarding the Agency's deliberative process privilege redactions in the

February 4, 2021, PowerPoint presentation. During the course of these discussions, Mr.

Hardin requested the Agency provide an informal *Vaughn* Index justifying its

deliberative process privilege withholdings, which the Agency provided to Plaintiff in

June 2022. The Agency subsequently provided an updated version of the *Vaughn* Index

in August 2022. On several other occasions, Mr. Hardin also requested the Agency

reconsider its withholdings and make additional releases. In an effort to narrow the

issues, the Agency agreed to make several additional discretionary releases of

information that were initially withheld under the deliberative process privilege. As part

of its discretionary releases, three slides were released in full, two slides were released

in part, and the titles for all eleven slides were released. These discretionary releases

were made on June 10, 2022, August 10, 2022, and October 25, 2022. Apart from these

discretionary releases, the Agency maintained all other Exemption 5 withholdings in the

PowerPoint based on its assertion of the deliberative process privilege.

13. On October 25, 2022, the Agency released its final updated version of the February 4,

2021, PowerPoint to Plaintiff with Exemption 5 redactions remaining on pages 3, 5-11.

**THE AGENCY'S ASSERTION OF FOIA EXEMPTION FIVE: DELIBERATIVE
PROCESS PRIVILEGE**

14. Notwithstanding the Agency's efforts to reach a mutually agreeable result, Mr. Hardin

emailed the Department of Justice on December 5, 2022, to provide written notice of

their intent to challenge all remaining redactions in the PowerPoint presentation.

Specifically, Plaintiff notified their intent to challenge the Agency's "claimed

deliberative process redactions on pp 3, 5-11 of 11 in the pdf ED_006414_00000550-

00005-11 in 'ED_006414_00000550_Formal_RWR – August 5, 2022 Release for EPA-

2021-006794.'"[3] As to the first and third documents EPA produced to Plaintiff, *Bates Stamp* ED_006414_00000549-00001 and ED_006414_00000562-00001 through ED_006414_00000562-00004, respectively, Plaintiff indicated that they do not challenge the Exemption 6 withholdings in the first and third documents.

15. Thus, it is my understanding that the only withholdings being challenged in this litigation are the Agency's redaction of certain information on eight slides, slides 3, 5-11, of the Agency's February 4, 2021, PowerPoint presentation (*Bates Stamp* ED_006414_00000550-0001 through ED_006414_00000550-0011).

16. The attached *Vaughn* index and this declaration, updated January 27, 2023, provides a detailed description of the portions of the PowerPoint withheld under Exemption 5, deliberative process privilege, and the basis for the Agency's withholding. As reflected in the Agency's *Vaughn* index, the withheld information reflects the Agency's then-developing strategies and proposals for regulating and reducing power sector pollution.

17. As indicated on the title slide, this PowerPoint presentation was prepared for a February 4, 2021, meeting between senior Agency officials and senior White House advisors to discuss the Agency's then-developing priorities and strategies for regulating and reducing power sector pollution. This meeting was held early in the new Presidential Administration at a time when Agency staff and managers were preliminarily developing and discussing their policy priorities and regulatory strategies for, *inter alia,* reducing power sector emissions. This PowerPoint reflects the then-current state of

---

[3] Mr. Hardin's December 5 email erroneously cites to an earlier, outdated version of the PowerPoint presentation that was released to Plaintiff on August 5, 2022 (ED_006414_00000550_Formal_RWR – August 5, 2022, Release for EPA-2021-006794). The Agency has conferred with Mr. Hardin and confirmed that he intended to cite to a later version of the PowerPoint, specifically, the version that was released on October 25, 2022, named "October 2022 Release – ED_006414_000000550_Formal_RWR."

those internal deliberations regarding the Agency's potential strategies. The PowerPoint also reflects the collaborative and advisory communications between the White House and Agency to develop and obtain feedback on potential regulatory strategies addressing the power sector. The PowerPoint outlines several potential strategies and paths forward for regulating power sector pollution, and in many instances, also contains internal analysis of the relative strengths and weaknesses of each approach. Thus, the decision making process involved is the Agency's development of regulatory priorities and strategies addressing power sector pollution, and this PowerPoint was prepared by Agency officials for the purpose of briefing the White House on these developing strategies and obtaining any comments, guidance, or feedback from the White House for consideration by Agency decision-makers. At the time the PowerPoint was created, the regulatory strategies, ideas, and options discussed therein were under continuing development and consideration by the Agency and do not represent any final Agency action or decision.

18. *Inter-/Intra-Agency Threshold.* In order to withhold records or information from release pursuant to Exemption 5 of the FOIA, they must be inter- or intra-agency records. Here, all information withheld from Plaintiff in the PowerPoint presentation pursuant to this exemption consists of information generated by the Agency, which is wholly internal to the Agency and the White House. The withheld information has never been circulated outside of the Executive Branch. As such, all information withheld pursuant to Exemption 5, deliberative process privilege, is "inter-agency" and satisfies the threshold of the exemption.

19. *Deliberative and Pre-Decisional.* The Agency withheld portions of the challenged record under FOIA Exemption 5, deliberative process privilege. The attached *Vaughn* index provides a detailed description of the portions of the record withheld under Exemption 5, deliberative process privilege, and the basis for withholding. As reflected in EPA's *Vaughn* index, the withheld information includes potential strategies for regulating and reducing power sector pollution.

20. The PowerPoint reflects the then-current state of the Agency's regulatory strategies and approaches for reducing power sector pollution that were under development and consideration by the Agency. The withheld information in this PowerPoint is deliberative because it reflects ongoing, internal discussions at the Agency about power sector pollution, including the Agency's then-current, and still-developing, internal group thinking about potential future regulatory strategies, rulemakings, and other associated strategic considerations for reducing power sector pollution. Many of the slides also contain internal Agency staff reflections and opinions concerning the efficacy of the proposed strategies. These proposed potential strategies, ideas, opinions, and reflections contained in the PowerPoint were developed internally at the Agency by Agency staff and managers in OAR, among other EPA offices, for consideration by Agency decision-makers and were presented to the White House in this PowerPoint to provide the White House with an opportunity to share questions and comments on the Agency's potential regulatory strategies for the power sector. At the time the PowerPoint was created, the Agency had not reached a final decision on any of the strategies or regulatory approaches discussed in the document.

21. *Slide 3*. On Slide 3 (page 3) of the PowerPoint presentation, the Agency has withheld text discussing potential strategies for regulating power sector emissions. The withheld information also consists of Agency staff members' initial thoughts as to the relative pros and cons of the identified strategic approaches, including the timing for implementing those approaches.

22. The withheld material on Slide 3 is pre-decisional because it includes a discussion of potential strategies for regulating power sector emissions that were developed and proposed by Agency staff for eventual presentation to Agency decision-makers. The strategies and proposals withheld from this slide do not reflect the Agency's final decision on this subject. The Agency has not yet reached a final decision as to the implementation of the proposed strategies discussed in this slide.

23. The information withheld on Slide 3 is deliberative because it reflects the internal weighing of the pros and cons of the possible future regulatory strategies discussed in the slide. The potential strategies and internal analysis, advisory opinions, and reflections concerning the identified strategies that were withheld from this slide were developed by EPA staff and managers for consideration by Agency decision-makers as they work to further develop and finalize their decisions on the regulatory strategies described in the PowerPoint. The information in this slide is also deliberative because it was prepared for the purpose of briefing the White House on the Agency's potential power sector regulatory strategies and to provide the White House with an opportunity to comment on the potential regulatory strategies under consideration by Agency decision-makers.

24. *Slide 5*. The information withheld from Slide 5 (page 5) of the PowerPoint presentation outlines the Agency's then-developing potential strategies for regulating power sector

discharges of pollutants and land pollution under the Clean Water Act and Resource

Conservation and Recovery Act, respectively. This slide identifies and discusses two

potential strategies that were developed and proposed by Agency staff for consideration

by Agency decision-makers. The strategies pertain to regulating and reducing water and

land pollution from the power sector, and the withheld material is also comprised of

internal Agency staff members' opinions of the relative pros and cons of the proposed

strategies.

25. The information withheld from this slide is pre-decisional because it discusses potential

strategies which do not reflect the Agency's final decision on this subject. The Agency

has not yet reached a final decision as to the potential strategies discussed in this slide.

26. The information withheld from this slide is deliberative because it reflects the ongoing

and then-developing internal discussions and weighing of pros and cons of the identified

strategies referenced in the slide. These potential strategies, and their accompanying staff

opinions and reflections on their efficacy also captured in the slide were developed

internally by Agency staff and managers for consideration by Agency decision-makers.

These potential strategies do not represent any final agency actions or decisions. The

information in this slide is also deliberative because it was prepared for the purpose of

briefing the White House on the Agency's potential power sector regulatory strategies

and to provide the White House with an opportunity to comment on the potential

regulatory strategies under consideration by Agency decision-makers.

27. *Slide 6*. Slide 6 (page 6) of the PowerPoint identifies potential strategies for reducing

emissions through Air Toxics Standards, including potential future rulemakings and other

regulatory actions under the Air Toxics program that were, and are still, under consideration by the Agency.

28. The information withheld from this slide did not reflect a final Agency decision or policy at the time the document was created, and, accordingly, is pre-decisional. The Agency has not yet reached a final decision on the potential strategies discussed in this slide.

29. The withheld information is deliberative because it is composed of proposed strategies developed by OAR staff and managers for consideration by Agency decision-makers. The withheld information is also deliberative because it contains Agency staff members' analysis and reflections of the efficacy of the identified strategies and includes a presentation of options for implementing the strategies. The information in this slide is also deliberative because it was prepared for the purpose of briefing the White House on the Agency's potential power sector regulatory strategies and to provide the White House with an opportunity to comment on the potential regulatory strategies under consideration by Agency decision-makers.

30. *Slide 7.* Slide 7 (page 7) of the PowerPoint presentation identifies the non-attainment provisions under the Clean Air Act as a potential strategy for regulating and reducing power sector emissions.

31. The Agency has not yet reached a final decision on the potential non-attainment strategies discussed in Slide 7. Because the document and withheld material therein was generated prior to finalizing a decision on these strategies and potential future regulatory actions, the withheld information is pre-decisional.

32. The information withheld from the body of Slide 7 is deliberative because it consists of the Agency's initial reflections and opinions on these strategies and identifies potential

11

future regulatory actions under the non-attainment provisions that were under consideration by Agency decision-makers at the time the document was created. The potential strategies discussed in this slide were developed by OAR staff and managers for consideration by Agency decision-makers, and the views and reflections contained in this slide reflect the ongoing, internal deliberations surrounding the potential strategies and regulations. The withheld information also consists of the Agency's then-developing ideas for how to implement such potential actions. The information in this slide is also deliberative because it was prepared for the purpose of briefing the White House on the Agency's potential power sector regulatory strategies and to provide the White House with an opportunity to comment on the potential regulatory strategies under consideration by Agency decision-makers.

33. *Slide 8.* Slide 8 (page 8) of the PowerPoint discusses potential strategies for reducing power sector emissions under Section 111(d) of the Clean Air Act. The Agency has withheld the second bullet point on this slide because it identifies a potential future rulemaking under consideration by the Agency.

34. Because the information on this slide was generated prior to finalizing a decision on the future rulemaking, the withheld information is pre-decisional. The Agency has not yet reached a final decision on the potential rulemaking discussed in this slide.

35. The withheld information is deliberative because it provides then-developing details and then-current analysis of the nature and impact of the potential future rulemaking discussed in this slide. The potential future rulemaking discussed in the withheld portion of the slide was developed internally by OAR staff and managers for consideration by Agency decision-makers. At the time this document was created, the Agency was

considering the proposed rulemaking identified in the second bullet on this slide, and the Agency has not yet reached a final decision on that proposed rulemaking effort. The information in this slide is also deliberative because it was prepared for the purpose of briefing the White House on the Agency's potential power sector regulatory strategies and to provide the White House with an opportunity to comment on the potential regulatory strategies under consideration by Agency decision-makers.

36. *Slide 9.* Slide 9 (page 9) discusses the potential regulatory strategies for regulating power sector emissions through the Regional Haze program. This text also addresses the pros and cons of adopting various strategies.

37. At the time the document was prepared, the Agency had not yet reached a final decision as to the proposed regulatory strategies discussed in the slide, and the Agency has not yet reached a final decision on those proposed strategies. Accordingly, the withheld information is pre-decisional.

38. The withheld information in this slide is deliberative because it reflects the back-and-forth discussions about strategic considerations associated with the proposed regulatory strategies referenced in the slide, and it discusses the pros and cons of the identified strategies under the Regional Haze program. The potential regulatory strategy discussed in this slide was developed internally by OAR staff and managers for consideration by Agency decision-makers. The information in this slide is also deliberative because it was prepared for the purpose of briefing the White House on the Agency's potential power sector regulatory strategies and to provide the White House with an opportunity to comment on the potential regulatory strategies under consideration by Agency decision-makers.

13

39. *Slide 10.* Slide 10 (page 10) identifies potential strategies and possible future regulatory actions for coal-fired units and includes a discussion of the priorities, key factors, and constraints of such regulations. As the title of the slide indicates, the matters discussed in this slide consist of proposed next steps for coal-fired units and do not represent any final Agency decisions or policy.

40. As of the date of the filing of this Declaration, the Agency is still considering its options with respect to the proposed strategies discussed in this slide. Because the information on this slide was generated prior to finalizing a decision on the strategies and potential future regulatory actions discussed in this slide, the withheld information is pre-decisional.

41. The withheld information is deliberative because it reflects the internal weighing of risks, benefits, and proposed strategies for implementing regulations for coal-fired units.  The slide also consists of strategic advice Agency decision-makers on which actions the Agency believes should be given consideration and the risk and benefits of adopting its advised approaches. The information in this slide is also deliberative because it was prepared for the purpose of briefing the White House on the Agency's potential power sector regulatory strategies and to provide the White House with an opportunity to comment on the potential regulatory strategies under consideration by Agency decision-makers.

42. *Slide 11.*  Slide 11 (page 11) identifies potential approaches and strategic considerations for regulating and reducing emissions from new natural gas units under Section 111(b) of the Clean Air Act. The withheld information identifies potential approaches reducing emissions, including possible future rulemakings and other identified strategies. The

14

withheld information also consists of a discussion of relevant considerations associated with the strategies identified in the PowerPoint.

43. The document was prepared prior to the Agency finalizing its regulatory approach for new natural gas units under Section 111(b), which is still under development and consideration by Agency decision-makers. Because the information on this slide was generated prior to finalizing a decision on the strategies and potential future regulatory actions discussed in the slide, the withheld information is pre-decisional.

44. The withheld information is deliberative because it captures Agency staff members' proposed strategies for regulating and reducing new natural gas units, including identification of potential regulatory strategies and weighing of the risks and benefits thereof. The proposed strategies discussed in the slide were developed by EPA staff for consideration by Agency decision-makers, and no final decision on the proposed strategies had been made at the time the document was created. The withheld information also consists of Agency staff members' ideas for how best to implement the proposed strategies. The information in this slide is also deliberative because it was prepared for the purpose of briefing the White House on the Agency's potential power sector regulatory strategies and to provide the White House with an opportunity to comment on the potential regulatory strategies under consideration by Agency decision-makers.

**FORESEEABLE HARM**

45. The Agency is tasked with regulating environmental contaminants and pollutants to protect human health. The Agency has withheld information on eight slides from the February 4, 2021, Power Point that, if released, would foreseeably harm the Agency's internal deliberative process that is vital in developing potential strategies for regulating

and reducing power sector pollution and other environmental contaminants. The

Agency's PowerPoint was created in the context of informing the White House as to the

Agency's current group thinking and then-developing strategies for regulating and

reducing power sector emissions, and, additionally, providing the White House with an

opportunity to comment on the implementation of new policy and regulatory actions at

the start of a new presidential administration. The withheld information contains

proposed strategies under consideration by the Agency and an analysis of the impact and

efficacy of the Agency's potential actions.

46. Disclosure of the withheld information will result in foreseeable harm to the Agency's

ability to openly discuss future policy and rulemaking. Plaintiff's requested disclosure

will chill the free exchange of ideas between Agency employees and White House

officials when identifying, analyzing, and discussing potential regulatory strategies for

regulating power plants and environmental contaminants in the future. As captured in

this Power Point, Agency staff members are currently able to freely express ideas,

strategies, and considerations for the Agency's decisionmakers on reducing power

sector pollution because those views are insulated from public scrutiny. The ongoing,

internal deliberations about the potential strategies, advice, opinions, and

recommendations that are withheld from the PowerPoint offer a window into the still-

ongoing discussions surrounding the Agency's power sector strategy. Many of the same

staff members involved in the development of these strategies outlined in this

PowerPoint are still employed at the Agency and still working on the very projects

discussed therein. Those staff members, along with others working on these projects,

will be discouraged from actively discussing the strategies, options, or recommendations

outlined in the PowerPoint that support good decision-making as the Agency moves towards finalizing its decision on these approaches.

47. Disclosure of redacted portions of the PowerPoint will discourage free and open discussions among Agency staff members working on the specific regulatory strategies referenced in the PowerPoint. Thus, there is foreseeable harm to future Agency work on these specific strategies discussed in the PowerPoint. Additionally, disclosure of this information would set the precedent, writ large, that sensitive discussions surrounding the development of sensitive regulatory matters are not protected from release and will consequently impair the Agency's ability to effectively conceptualize, develop, analyze, and discuss regulatory strategies – chilling important Agency work and government decision-making. Additionally, release of the information would chill Agency staff members from frankly discussing the *weaknesses* of potential regulatory strategies and approaches for fear that such admissions of uncertainty would be used against us in litigation even if future development of the approach or regulatory strategy led us to bolster the record and our confidence in the approach.

48. Furthermore, disclosure of the withheld information would lead to significant public confusion about whether the regulatory strategies and rulemakings discussed in the PowerPoint reflect the Agency's final policies and positions. Given that the PowerPoint contains goals and contemplated future actions that may be taken by the Agency, there is substantial potential for these propositions to be inaccurately construed by the public as future commitments, past actions, or provisions already in place.

49. Were the PowerPoint to be released, Agency employees would be deterred from openly strategizing about the regulation of harmful contaminants or pollution for fear of

17

creating public confusion or being subject to public ridicule.  As a result, the ability of

Agency staff to collaborate fully with Agency decision-makers and senior White House

advisors would be significantly hindered and would undermine the integrity of the

rulemaking process. Given the above-mentioned considerations, based on my review of

the information at issue and my discussions with knowledgeable personnel, I have

determined that there is reasonably foreseeable harm as to the disclosure of information

protected by the deliberative process privilege.

**SEGREGABILITY**

50. As reflected in the *Vaughn* index, the Agency has conducted a line-by-line review of the

record and determined that all segregable information has been released to Plaintiff. To

the extent any of this withheld information contains facts, the facts reflect Agency

deliberations. The selection of those facts was an integral part of the deliberations, and

the factual information contained therein is inextricably intertwined with the deliberative

discussion concerning these records.


Pursuant to 28 U.S.C. § 1746, I hereby affirm under penalty of perjury that the foregoing
declaration is true and correct.

Executed this 27th day of January, 2023.


_____

John Shoaff, Director
Office of Air Policy and Program Support
Office of Air and Radiation

U.S. Environmental Protection Agency

# Exhibit A

FOIA Request EPA-2021-006794

| **Document ID No.**: ED_006414_00000550 | **Document Date**: February 4, 2021 |
|---|---|

| **Document Title**: "Power Sector Strategy: Climate, Public Health, Environmental Justice" ||

| **Disposition:** Release with Redactions.     **Exemption**: Ex. 5 DPP ||

| **Brief Description:** PowerPoint Presentation ||

*Exemption 5 Deliberative Process Privilege*

The withheld material in this PowerPoint presentation consists of internal, pre-decisional, and deliberative material, the release of which would cause substantial harm, properly withheld under the deliberative process privilege of Exemption 5.

The record is an inter-agency communication
The PowerPoint was created to identify options, priorities, and other strategic considerations for addressing the effects of power sector pollution on human health and the environment. This document was prepared by EPA officials for discussion at a future briefing on the Agency's proposed power sector strategy with the White House Office of Domestic Climate Policy. The document has never been released outside of the Executive Branch of the United States Government.

The withheld material is pre-decisional
This PowerPoint was created early in the new Presidential Administration to brief the White House on strategies under consideration at EPA for regulating and reducing power sector pollution. The material withheld from this PowerPoint presentation consists of specific proposed strategic, regulatory, and policy options under consideration for reducing power sector pollution and includes internal opinions on the pros and cons of the various identified options. Specifically, the withheld material is pre-decisional because it identifies and discusses the non-public rulemakings and other regulatory strategies that EPA was in the process of developing, and was considering promulgating, at the time the PowerPoint was created. In each instance where information was withheld, a final decision on whether to promulgate the underlying proposed rule or pursue the identified action under consideration has not been made and is still pending.

The withheld material is deliberative
The withheld material is deliberative because it reflects the give-and-take of the consultative process that occurs when determining the Agency's regulatory strategy. Specifically, the selection of material in this PowerPoint reflects the Agency's first take on priorities and options for regulating the power sector, including Agency officials' preliminary thoughts, opinions, and recommendations about the advantages and disadvantages, potential risks and considerations, and relative efficacy of each identified option under consideration. The thoughts, opinions, reflections, and strategies selected for inclusion in this PowerPoint reflect ongoing, internal Agency deliberations that were, and are, part of the Administration's power sector strategy

decision-making process. All withheld material reflects matters that were, and still are, under consideration by Agency and Administration decision-makers. The withheld information in this PowerPoint is also deliberative because it was prepared for the purpose of briefing the White House on the Agency's potential power sector regulatory strategy options and to provide the White House with an opportunity to share questions and comments on the Agency's potential regulatory strategy options for the power sector that were under consideration by Agency decision-makers. The deliberative nature of each redaction is addressed below:

### Slide 3 (*ED_006414_00000550-00003*)
The withheld material from slide 3 is deliberative because it discusses, from a timing perspective, the pros and cons of different strategies for regulating emissions from the power sector. The selection of material appearing in this slide reflects the Agency's first take on how the identified timing considerations might impact the Agency's decision-making process for reducing pollution from the power sector through certain strategies outlined in the slide. Additionally, the withheld material from slide 3 is pre-decisional because it identifies timing considerations for regulatory actions and potential future rulemakings that were, and are still, under consideration.

### Slide 5 (*ED_006414_00000550-00005*)
The withheld material from slide 5 is deliberative because it discusses the pros and cons of potential options for regulating discharges of pollutants under the Clean Water Act and land pollution from the power sector under Resource Conservation and Recovery Act. The selection of material appearing in this slide reflects the Agency's first take on potential options under consideration for reducing pollution and discharges of pollutants from the power sector. Additionally, the withheld material from slide 5 is pre-decisional because it identifies potential future regulatory strategies that were, and are still, under consideration.

### Slide 6 (*ED_006414_00000550-00006*)
The withheld material from slide 6 is deliberative because it discusses the pros and cons of potential Air Toxics strategies for reducing power sector emissions. The selection of material appearing in this slide reflects the Agency's first take on how the proposed strategies might impact the Agency's decision-making process for reducing emissions from the power sector, including a behind-the-scenes evaluation of the relative advantages and disadvantages of the identified strategies.  Additionally, the withheld material from slide 6 is pre-decisional because it identifies potential future rulemakings and other regulatory actions under the Air Toxics program that were, and are still, under consideration.

### Slide 7 (*ED_006414_00000550-00007*)
The withheld material from slide 7 is deliberative because it identifies and discusses the pros and cons of the non-attainment provisions under the Clean Air Act as a potential strategy for reducing power sector emissions. The withheld material appearing in this slide reflects the behind-the-scenes weighing of pros and cons of pursuing the identified regulatory strategy under the non-attainment provisions, which includes opinions on the efficacy and potential paths for implementation of the identified strategy. Additionally, the withheld material from slide 7 is pre-decisional because it identifies potential future rulemakings and other regulatory actions through

the use of the Clean Air Act's non-attainment provisions that were, and are still, under consideration.

***Slide 8 (ED_006414_00000550-00002)***
The withheld material from slide 8 is deliberative because it describes internal perspectives, opinions, and recommendations regarding a potential future regulatory effort under Clean Air Act Section 111(d). The withheld material also consists of strategic considerations associated with the identified regulatory strategy. The selection of material appearing in this slide reflects the Agency's first take on how the identified considerations might impact the Agency's decision-making process for reducing emissions from the power sector.  The withheld material from Slide 8 is pre-decisional because it identifies potential a potential future regulatory strategy under Section 111(d) that was under consideration at the time the document was created.

***Slide 9 (ED_006414_00000550-00009)***
The withheld material from slide 9 is deliberative because it discusses the pros and cons of identified potential regulatory strategies under the Regional Haze program. The withheld material directly identifies potential future actions still under consideration by the Agency and includes Agency personnel opinions, advice, and analysis of the identified potential regulatory strategies. The selection of material appearing in this slide reflects the Agency's first take on how the identified Regional Haze strategies might impact the Agency's decision-making process for reducing emissions from the power sector. Additionally, the withheld material from slide 9 is pre-decisional because it identifies potential future regulatory actions under the Regional Haze program that were, and are still, under consideration.

***Slide 10 (ED_006414_00000550-00010)***
The withheld material from slide 10 is deliberative because it proposes potential next steps for regulating pollution from the power sector, and it identifies key strategic considerations associated with the identified potential next steps. The selection of material appearing in this slide reflects the Agency's first take on priorities associated with the potential regulatory action proposed in the slide and how the identified considerations in the slide might impact the Agency's decision-making process for this action. Additionally, the withheld material from slide 10 is pre-decisional because the Agency has not yet made a final decision on whether or how to pursue and implement any of the identified regulatory strategies for the identified sector. Accordingly, the withheld material in slide 10 is pre-decisional.

***Slide 11 (ED_006414_00000550-00011)***
The withheld material from slide 11 is deliberative because it discusses potential options and strategies for regulating emissions from new natural gas units. The withheld material is still under consideration by the Agency as it moves towards finalizing a decision on the strategies discussed in this slide. The withheld material in this slide consists of the behind-the-scenes weighing of pros and cons of the identified strategies discussed in the slide. The withheld information also consists of additional strategic considerations associated with the proposed paths forward. Additionally, the withheld material from slide 11 is pre-decisional because it identifies potential regulatory efforts and rulemakings under consideration by the Agency at the time the document was created. The Agency has not yet made a final decision on whether to

pursue any of the identified regulatory strategies or how to implement such strategies. Accordingly, the withheld material in slide 11 is pre-decisional.

Foreseeable harm
Release of the withheld information will cause foreseeable harm because it would discourage open and frank discussions between and among Agency and Executive Branch officials in sensitive decision-making processes such as regulation of the power sector. Because this PowerPoint presentation sets forth the Agency's options, priorities, and strategy for regulating the power sector that were under consideration when the document was created, release of the withheld information will have a chilling effect on similar, internal discussions on policy and regulatory options in the future by setting the precedent that Agency employees' sensitive discussions, opinions, and proposed strategies for proceeding with certain proposed regulatory actions without those discussions becoming public. Specifically, if the withheld information were released, it would discourage the continued full and frank discussion of the strategies discussed in the PowerPoint as these potential strategies move towards a final decision. This will, in turn, undermine the integrity of important regulatory work at the Agency because employees will be discouraged from candidly discussing all aspects of potential rulemakings, particularly as it relates to comments and opinions about the weaknesses of potential rulemakings and regulatory strategies, out of concern that their uncertainty may be used against the Agency in future litigation, even though future development of the regulatory strategy bolstered the record and our confidence in the approach. The information withheld from this PowerPoint consists of the core recommendations, opinions, and impressions advanced by Agency employees in deciding on a strategy for regulation of pollution from the power sector. Protecting the confidentiality of such fundamentally deliberative material is critical at the Agency, as it promotes the candid exchange of internal advice, opinions, and strategic and policy options necessary for effectively executing its regulatory function. If Agency staff were aware from the outset that the withheld information would be subject to public disclosure, then concerns for such disclosure would discourage candid internal communications and deliberations about future regulatory actions. Further, release of the material would prematurely disclose proposed policies and strategic regulatory options under consideration before the Agency reaches a final decision on whether to adopt any of the proposals. To the extent any of the proposals in the PowerPoint are, in fact, adopted by the Agency, premature disclosure of the deliberative material in these slides threatens to cause public confusion by disclosing reasons and rationales that may not ultimately form the basis of EPA's actions.

Segregability
All non-exempt information in this record has been released, and there is no reasonably segregable information remaining. EPA released slides 1, 2, and 4 in full and withheld portions of slides 3, and 5-11.

# Exhibit B

## FREEDOM OF INFORMATION ACT REQUEST

September 28, 2021

National FOIA Office
U.S. Environmental Protection
Agency 1200 Pennsylvania
Avenue NW (2310A)
Washington, DC 20460

### Re: FOIA Request - Certain Agency Records (Correspondence)

Dear Sir or Madam:

On behalf of Energy Policy Advocates, a non-profit organization incorporated under the laws of Washington State, pursuant to theFreedom of Information Act (FOIA), 5 U.S.C. § 552 *et seq*., I hereby request copies of the following records: all electronic correspondence, whether email, text, SMS, etc., and any accompanying information, including also any attachments, a) sent to or from or which copies (whether as cc: or bcc:) i) Campbell.Ann@epa.gov and/or ii) rakosnik.delaney@epa.gov, that b) was also sent to or from or which copies (again,whether as cc: or bcc:) or mentions, *anywhere*, National Climate Advisor Gina McCarthy (including "Gina" and/or "McCarthy"), that also c) includes, *anywhere*, the following terms: i) "CO2", ii) "NAAQS", iii) "GHG" (including in "GHGs"), and/or iv) "Paris", and d) is dated January 21, 2021 through the date you process this request, inclusive.

We request entire "threads" of which any responsive electronic correspondence is a part, regardless whether any portion falls outside of the above time parameter.

**Please consider as non-responsive electronic correspondence that merely receives or forwards newsletters or press summaries or 'clippings', such as news services or stories or opinion pieces, if that correspondence has no comment or no substantive comment added by a party other than the original sender in the thread**

1

(an electronic mail message that includes any expression of opinion or viewpoint would be considered as including substantive comment; examples of non-responsive emails would be those forwarding a news report oropinion piece with no comment or only "fyi", or "interesting").

**Additionally**, please consider all published or docketed materials, including pleadings, regulatory comments, ECF notices, news articles, and/or newsletters, as non-responsive, unless forwarded to or from the named persons with substantive commentary added by the sender.

For this request, the term "all records" refers to, but is not limited to, any and all documents, correspondence (including, but not limited to, inter and/or intra-agency correspondence as well as hard copy or electronic correspondence with entities or individuals outside the federal government), emails, text, SMS, Telegram, Signal, WhatsApp or other instant messages, letters,notes, telephone records, telephone notes, minutes, memoranda, comments, files, presentations,consultations, biological opinions, assessments, evaluations, schedules, telephone logs, digital logs such as those produced by Microsoft Teams (including Teams file folders or collaborative work documents housed in Teams), papers published, and/or unpublished, reports, studies, photographs and other images, data (including raw data, GPS or GIS data, UTM, LiDAR, etc.), maps, and/or all other responsive records.

This request is not meant to exclude any other record(s) or part(s) thereof that, although not specifically requested, are reasonably related to the subject matter of this request. If you or your office have destroyed or determine to withhold any records that could be reasonably construed to be responsive to this request, I ask that you indicate this fact and the reasons therefore in your response.

Under the FOIA Improvement Act of 2016, agencies are prohibited from

denying requests for information under the FOIA unless the agency reasonably believes release of the information will harm an interest that is protected by the exemption. FOIA Improvement Act of 2016 (Public Law No. 114-185), codified at 5 U.S.C. § 552(a)(8)(A).

Should you decide to invoke a FOIA exemption, please include sufficient information for us to assess the basis for the exemption, including any interest(s) that would be harmed by release. Please include a detailed ledger which includes:

1. Basic factual material about each withheld record, including the originator, recipients, date, length, general subject matter, and location of each item; and

2. Complete explanations and justifications for the withholding, including the specific exemption(s) under which the record (or portion thereof) was withheld and a full explanation of how each exemption applies to the withheld material. Such statements will be helpful in deciding whether to appeal an adverse determination. Your written justification may help to avoid litigation.

If you should seek to withhold or redact any responsive records or parts thereof, we request that you: (1) identify each such record with specificity (including date, author, recipient, and parties copied); (2) explain in full the basis for withholding responsive material; and (3) provide all segregable portions of the records for which you claim a specific exemption. 5 U.S.C. § 552(b). Please correlate any redactions with specific exemptions under FOIA.

EPA is willing to receive records on a rolling basis, but only within the requirements of FOIA.

**Format of Requested Records**

Under FOIA, you are obligated to provide records in a readily accessible electronic format and in the format requested. See, *e.g.,* 5 U.S.C. § 552(a)(3)(B) ("In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format.").

"Readily accessible" means text-searchable and OCR-formatted. See 5 U.S.C. § 552(a)(3)(B).

Energy Policy Advocates requests records on your system, e.g., its backend logs, and does not seek only those records which survive on an employee's own machine or account. We do not demand your office produce requested information in any particular form, instead **we request records in their native form**, with specific reference to the U.S. Securities and Exchange Commission Data Delivery Standards. The covered information we seek is electronic information, this includes electronic *records*, and other public *information*.

We seek responsive records in their native form, with specific reference to the U.S. Securities and Exchange Commission Data Delivery Standards.[1] The covered information we seek is electronic information, this includes electronic *records*, and other public *information*. To quote the SEC Data Delivery Standards, "Electronic files must be produced in their native format, *i.e.,* the format in which they are ordinarily used and maintained during the normal course of business. For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. *(Note: An Adobe PDF file is not considered a native file unless the document was initially created as a PDF.)*" (emphases in original).

In many native-format productions, certain public information remains contained in the record (e.g., metadata). Under the same standards, to ensure production of all information requested, if your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name, and 2) make that unique metadata part of your production.

Native file productions may be produced without load files. However, native file productions must maintain the integrity of the original meta data and must be produced as they

---

[1] https://www.sec.gov/divisions/enforce/datadeliverystandards.pdf.

are maintained in the normal course of business and organized by custodian-named file folders. A separate folder should be provided for each custodian.

In the event that necessity requires your office to produce a PDF file, due to your normal program for redacting certain information and such that native files cannot be produced as they are maintained in the normal course of business, in order to provide all requested information each PDF file should be produced in separate folders named by the custodian, *and* accompanied by a load file to ensure the requested information appropriate for that discrete record is associated with that record. The required fields and format of the data to be provided within the load file can be found in Addendum A of the above-cited SEC Data Standards. All produced PDFs must be text searchable.

We appreciate the inclusion of an index.

**Fee Waiver Request**

**Our request for fee waiver is in the alternative, first for reasons of significant public interest, and second, on the basis of the Energy Policy Advocates' status as a media outlet**. The Department must address both of these requests for fee waiver in the event it denies one; failure to do so is *prima facie* arbitrary and capricious.

FOIA was designed to provide citizens a broad right to access government records. FOIA's basic purpose is to "open agency action to the light of public scrutiny," with a focus on the public's "right to be informed about what their government is up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773-74 (1989) (internal quotation and citations omitted). In order to provide public access to this information, FOIA's fee waiver provision requires that "[d]ocuments shall be furnished without any charge or at a [reduced] charge," if the request satisfies the standard. 5 U.S.C. § 552(a)(4)(A)(iii). FOIA's fee waiver requirement is "liberally construed." *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C.

Cir. 2003); *Forest Guardians v. U.S. Dept. of Interior*, 416 F.3d 1173, 1178 (10th Cir. 2005).

The 1986 fee waiver amendments were designed specifically to provide non-profit organizations such as EPA access to government records without the payment of fees. Indeed, FOIA's fee waiver provision was intended "to prevent government agencies from using high fees to discourage certain types of requesters and requests," which are "consistently associated with requests from journalists, scholars, and non-profit public interest groups." *Ettlinger v. FBI*, 596 F.Supp. 867, 872 (D. Mass. 1984) (emphasis added). As one Senator stated, "[a]gencies should not be allowed to use fees as an offensive weapon against requesters seeking access to Government information" 132 Cong. Rec. S. 14298 (statement of Senator Leahy).

## I. EPA Qualifies for a Fee Waiver.

Under FOIA, a party is entitled to a fee waiver when "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the [Federal] government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). See also, 22 C.F.R. § 171.16.

First, as explained herein, the federal government acknowledges EPA's status as a media requester. Further, in the alternative thus, the Department must consider four factors to determine whether a request is in the public interest: (1) whether the subject of the requested records concerns "the operations or activities of the Federal government," (2) whether the disclosure "is likely to contribute" to an understanding of government operations or activities, (3) whether the disclosure "is likely to contribute to public understanding" of a reasonably broad audience of persons interested in the subject, and (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities. 22 C.F.R. § 171.16. As shown below, EPA and this request meet each of these factors.

A. The Subject of This Request Concerns "the Operations and Activities of the Government."

The subject matter of this request concerns the operations and activities of senior officials. This request asks for: All records pertaining or relating to ethics waivers and/or recusals of Ms. McCarthy. This request includes, but is not limited to, any final memoranda developed for the purpose of outlining recusal obligations, potential conflicts of interest that might involve former employers, their clients or members, and any particular matters that have been identified, as well as any waivers issued by Administration officials. This request also includes any and all communications, including written analysis in any form, by and to officials regarding meeting requests with non-governmental entities involving Ms. McCarthy. If any requested records were produced prior to the official start date of Ms. McCarthy, those should also be included.

B. Disclosure is "Likely to Contribute" to an Understanding of Government Operations or Activities.

As described, above, the requested records are meaningfully informative about government operations or activities and will contribute to an increased understanding of those operations and activities by the public.

The requested records, if they exist, pertain to the sweeping environmental regulatory agenda of the Biden Administration, which is of major media, public and policy interest. Public records indicate that Acting Air Chief Joe Goffman uses Ms. Campbell and Ms. Rakosnik to correspond with his contacts from their own email accounts, avoiding the use of his EPA email account, which account public records also show is the subject of great public interest. Taking this step makes records responsive to this request inherently therefore also of public interest but more so.  Any records responsive to this request therefore are likely to have an informative value and are "likely to contribute to an understanding of Federal government operations or activities".

We note President Biden's environmental agenda has been the subject of substantial

media interest and promotional efforts.[2]

Disclosure of the requested records will allow EPA to convey to the public information

about whether officials such as Ms. McCarthy, who is charged with assisting in and executing

policy and the duties of office, are acting consistently with all of the laws, rules, and

regulations that govern the actions and activities of a high-ranking and non-career government

official. After disclosing records relating to the ethics obligations of Ms. McCarthy, EPA will

inform the public about the ethics obligations and actions of Ms. McCarthy in order to ensure

decisions that are being made consistent with the law. Once the information is made available,

EPA will analyze it and present it to its followers and the general public in a manner that will

meaningfully enhance the public's understanding of this topic.

Thus, the requested records are likely to contribute to an understanding of government

operations and activities.

C. Disclosure of the Requested Records Will Contribute to a Reasonably Broad Audience
of Interested Persons' Understanding of the Ethics Obligations of a Non-Career
Appointees.

For reasons already described, the requested records will contribute to public

understanding of the ethics advice provided by career officials, to help ensure future actions,

decisions, and deliberations of non-career appointees are conducted in a compliant manner.

As explained above, the records will contribute to public understanding of this topic.

Ethics obligations exist to reduce the likelihood that senior government officials are

making decisions in a biased or arbitrary manner or to benefit the interests of former

---

[2] https://www.washingtonpost.com/climate-environment/2021/01/26/biden-environmental- justice-
climate/ and https://www.epa.gov/newsreleases/epa-welcomes-members-biden-harris-leadership-team
(last assessed April 8, 2021).

9

employers, clients or related parties. Ensuring the avoidance of conflicts of interest or the appearance of bias is of interest to a reasonably broad segment of the public. EPA will use the information it obtains from the disclosed records to educate the public at large about what obligations have been identified for Ms. McCarthy. *See W. Watersheds Proj. v. Brown*, 318 F.Supp.2d 1036, 1040 (D. Idaho 2004) ("... find[ing] that WWP adequately specified the public interest to be served, that is, educating the public about the ecological conditions of the land managed by the BLM and also how ... management strategies employed by the BLM may adversely affect the environment.").

Through EPA's synthesis and dissemination (by means discussed in Section II, below), disclosure of information contained and gleaned from the requested records will contribute to a broad audience of persons who are interested in the subject matter. *Ettlinger v. FBI*, 596 F.Supp. at 876 (benefit to a population group of some size distinct from the requester alone is sufficient);*Carney v. Dep't of Justice*, 19 F.3d 807, 815 (2d Cir. 1994), cert. denied, 513 U.S. 823 (1994) (applying "public" to require a sufficient "breadth of benefit" beyond the requester's own interests); *Cmty. Legal Servs. v. Dep't of Hous. & Urban Dev.*, 405 F.Supp.2d 553, 557 (E.D. Pa.2005) (in granting fee waiver to community legal group, court noted that while the requester's "work by its nature is unlikely to reach a very general audience," "there is a segment of the public that is interested in its work").

Indeed, the public does not currently have an ability to easily evaluate the requested records, which concern the integrity of actions taken by Ms. McCarthy since the new Administration took over. We are also unaware of any previous release to the public of these or similar records. See *Cmty. Legal Servs. v. HUD*, 405 F.Supp.2d 553, 560 (D. Pa. 2005) (because requested records "clarify important facts" about agency policy, "the CLS request

would likely shed light on information that is new to the interested public."). As the Ninth Circuit observed in *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1286 (9th Cir. 1987), "[FOIA] legislative history suggests that information [has more potential to contribute to public understanding] to the degree that the information is new and supports public oversight of agency operations".

Disclosure of these records is not only "likely to contribute," but is certain to contribute, to public understanding of what obligations senior officials such as Ms. McCarthy have and whether they are able to compliantly participate in the many activities in which their official position may otherwise be expected to participate in. The public is always well served when it knows how the government conducts its activities, particularly matters touching on ethics questions. Hence, there can be no dispute that disclosure of the requested records to the public will educate the public about the potential conflicts of interest and recusal obligations of non-career appointees.

D. Disclosure is Likely to Contribute Significantly to Public Understanding of Government  Operations or Activities.

EPA is not requesting these records merely for their intrinsic informational value. Disclosure of the requested records will significantly enhance the public's understanding of the potential conflicts of interest and likelihood of an appearance of bias in decision-making as compared to the level of public understanding that exists prior to the disclosure. Indeed, public understandingwill be significantly increased as a result of disclosure.

The records are also certain to shed light on the Administration's compliance with its own ethics proclamations in that they pertain to officials covered by ethics disclosure and recusal obligations. Such public oversight of agency action is vital to our democratic system and clearly envisioned by the drafters of the FOIA. Thus, EPA meets this factor as well.

II. EPA has the Ability to Disseminate the Requested Information Broadly.

EPA is dedicated to obtaining and disseminating information relating to energy and environmental public policy. A key component of being able to fulfill this mission and educatethe public about these duties is access to information that articulates what obligations exist for senior government officials. has both the intent and the ability to convey any information obtained through this request to the public. Energy Policy Advocates publishes its findings regularly through the organization's website, www.epadvocates.org. This work is frequently cited in newspapers and trade and political publications.[3] EPA intends to publish information from requested records on its website, distribute the records and expert analysis to its followersthrough social media channels including Twitter, Facebook, and other similar platforms.

Through these means, EPA will ensure: (1) that the information requested contributes significantly to the public's understanding of the government's operations or activities; (2) that the information enhances the public's understanding to a greater degree than currently exists; (3) that EPA possesses the expertise to explain the requested information to the public; (4) that EPA possesses the ability to disseminate the requested information to the general public; (5) and that the news media recognizes EPA as a reliable source in the field of government officials' conduct.

Public oversight and enhanced understanding of the Administration's duties is absolutely necessary. In determining whether disclosure of requested information will contribute significantly to public understanding, a guiding test is whether the requester will disseminate the information to a reasonably broad audience of persons interested in the

---

[3] *See*, e.g., recent coverage at Editorial, *Wall Street Journal*, "Biden's 'BackDoor' Climate Plan," March 17, 2021, https://www.wsj.com/articles/bidens-backdoor-climate-plan-11616020338, and Stuart Parker, "Conservative Group Says States' Ozone Suit 'Trojan Horse' for GHG Limits," Inside EPA, February 24, 2021.

subject. *Carney v U.S. Dept. of Justice*, 19 F.3d 807 (2nd Cir. 1994). EPA need not show how it intends to distribute the information, because "[n]othing in FOIA, the [agency] regulation, or our case law require[s] such pointless specificity." *Judicial Watch*, 326 F.3d at 1314. It is sufficient for EPA to show how it distributes information to the public generally. *Id*.

III. Obtaining the Requested Records is of No Commercial Interest to the Requester.

Access to government records, disclosure forms, and similar materials through FOIA requests is essential to EPA's role of educating the general public. EPA is a 501(c)(3) nonprofit public policy institute dedicated to transparency in public energy and environmental policy. Due to its nonprofit mission, EPA has no commercial interest and will realize no commercial benefit from the release of the requested records.

Therefore, **Energy Policy Advocates first seeks waiver of any fees** under FOIA on the above significant public interest basis.

**In the alternative**, Energy Policy Advocates requests a waiver or reduction of fees as a representative of the news media. The provisions for determining whether a requesting party is a representative of the news media, and the "significant public interest" provision, are not mutually exclusive. As Energy Policy Advocates is a non-commercial requester, it is entitled to liberal construction of the fee waiver standards. 5 U.S.C.S. § 552(a)(4)(A)(iii), *Perkins v. U.S. Department of Veterans Affairs*, 754 F.Supp.2d. 1 (D.D.C. 2010). Alternately and only in the event the Agency refuses to waive our fees under the "significant public interest" test, which Requester would then appeal while requesting the Agency proceed with processing on the grounds that Energy Policy Advocates is a media organization, a designation the federal government has acknowledged for the purposes of FOIA, the Agency must explain any denial

13

of treatment of EPA as a media outlet.[4] Requester asks for a waiver or limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by.   a representative of the news media…").

The Agency must address both of these requests for fee waiver in the event it denies one;failure to do so is *prima facie* arbitrary and capricious.

Energy Policy Advocates looks forward to your response. If you have any questions, please contact me at the below email address. All records and anyrelated correspondence should be sent to my attention at the address below. If you have any questions, please contact me at the below email address.

Sincerely,
Rob Schilling, Executive Director
Energy Policy Advocates
Schilling@allhookedup.com

---

[4] *See*, e.g., Securities & Exchange Commission Requests No. 21-00769-FOIA, No. 21-01234-FOIA; Department of the Interior Request No. DOI-OS-2021-003335.

# Exhibit C

| Extension Due to Unusual Circumstances for FOIA Number EPA-2021-006794 to May 2, 2022 | Sabrina Hamilton | Mr. Matthew D Hardin | 01/18/2022 | | |

Dear Mr. Hardin: The Office of Air and Radiation (OAR) apologize for the delay in finalizing your FOIA request. Given the scope of your FOIA request and the voluminous amount of records, OAR is in the final stages of receiving the collected documents which requires the need to coordinate with other program offices within the agency for final review and approval. We have also determined there are other Federal agencies that have equities in these records and are waiting for their inter-agency review to be completed.  OAR anticipates the completion of your FOIA request by May 2, 2022, and therefore are requesting an extension of the due date until then. It is possible that we may complete your request sooner and will inform you of any changes with the timing of the completion of your request through FOIAonline. If you have any questions or would like to discuss this matter further, please contact Larry Weinstock at weinstock.larry@epa.gov or (202) 564-9226. Additionally, you may seek assistance from EPA's FOIA Public Liaison at hq.foia@epa.gov or (202) 566-1667, or from the Office of Government Information Services (OGIS). You may contact OGIS in any of the following ways: by mail, Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, MD 20740-6001; email, ogis@nara.gov ; telephone, (301) 837-1996 or (877) 684-6448; or fax, (301) 837-0348. Thank you for your patience while we continue to process your request. Sincerely,   Sabrina Hamilton Air and Radiation Liaison Specialist  and FOIA Coordinator