## HEARINGS

## Hearing on the Nomination of Joseph Goffman to be Assistant Administrator for Air and Radiation of the Environmental Protection Agency

**March 1, 2023 10:00 AM**

406 Dirksen Senate Office Building

## Joseph Goffman

Assistant Administrator, Office of Air and Radiation at the Environmental Protection Agency

**Related Files**

03-01-2023 Goffman Testimony.pdf (124.4 KBs)

Return to Hearing

**Related Files**

SPW 03012023.pdf (654.3 KBs)

Permalink: https://www.epw.senate.gov/public/index.cfm/2023/3/hearing-on-the-nomination-of-joseph-goffman-to-be-assistant-administrator-for-air-and-radiation-of-the-environmental-protection-agency


Table of Contents

U.S. Senate                          Date:  Wednesday, March 1, 2023

Committee on Environment
      and Public Works

Washington, D.C.

STATEMENT OF:                                          PAGE:

THE HONORABLE THOMAS R. CARPER, A UNITED STATES
      SENATOR FROM THE STATE OF DELAWARE                    3

THE HONORABLE SHELLEY MOORE CAPITO, A UNITED STATES
      SENATOR FROM THE STATE OF WEST VIRGINIA               7

JOSEPH GOFFMAN, NOMINATED TO BE ASSISTANT
      ADMINISTRATOR, OFFICE OF AIR AND RADIATION
      AT THE ENVIRONMENTAL PROTECTION AGENCY               15

HEARING ON THE NOMINATION OF JOSEPH GOFFMAN TO BE ASSISTANT
ADMINISTRATOR FOR AIR AND RADIATION OF THE ENVIRONMENTAL PROTECTION
AGENCY


Wednesday, March 1, 2023


United States Senate

Committee on Environment and Public Works

Washington, D.C.

    The committee, met, pursuant to notice, at 10:04 a.m. in room
406, Dirksen Senate Office Building, the Honorable Thomas R. Carper
[chairman of the committee] presiding.

    Present: Senators Carper, Capito, Cardin, Markey, Kelly, Padilla,
Cramer, Lummis, Wicker, Sullivan, Mullin, Ricketts.

STATEMENT OF THE HONORABLE THOMAS R. CARPER, A UNITED STATES SENATOR FROM THE STATE OF DELAWARE

Senator Carper.  Good morning, everybody.  I want to call this hearing to order.

We have gathered here today for a second time to consider Joe Goffman's nomination to serve as the Environmental Protection Agency's Assistant Administrator for the Office of Air and Radiation.  Joseph, we thank you for your previous service to our Country and for your willingness to serve us again in this role.

I understand you are joined here by at least one member of your family.  Over your left shoulder, I think I see three young women sitting there.  One of them is your wife, the one in the middle.  We just say welcome.  For you, I said this to Shelley before we started, for her, no purgatory, straight to heaven.  Being married to people who do what we do or what you do, there is a special place in heaven for you, so thank you for that.  I know he appreciates your being here with him today.

For those participating in and watching today's hearing, it may seem a little like we are reliving the plot of the movie, one of my favorite movies, Groundhog Day.  Nine months ago, Mr. Goffman came before our committee to field questions from our members.  While a lot can change in nine months, Joe's qualifications for this important leadership role, his commitment to fair outcomes, and his nomination's broad support from stakeholder groups all remain unchanged.

Let me first address Mr. Goffman's experience and his qualifications.  As I said before, the Assistant Administrator for the

Office of Air and Radiation has an outsized impact on our lives.  The American people deserve someone serving in this position who is committed to reducing planet-warming climate pollution while also improving our vehicle emissions standards and protecting public health, all of which go hand-in-hand with economic growth and job creation.

From the earliest days of his career, when he helped develop the Clean Air Act Amendments of 1990 as a staff member on this very committee, to his time at EPA under Presidents Obama and now Biden, Joe Goffman has dedicated his life's work to cleaning up the air we breathe and protecting our one and only planet.

Importantly, he follows the law in a way that also provides the predictability and certainty that industry wants and needs.  I just led a Congressional delegation, bipartisan and bicameral, last week to Honduras, Guatemala, and Mexico.  We met a lot with the business community down there.  One of the keys to slowing and stopping illegal immigration is making sure that people have jobs there and that they can support themselves and their families down there.

One of the things that is tantamount and really important to doing that is certainty and predictability.  We heard that again and again and again from the business community in Latin America, and we hear it all the time from the business community here: certainty and predictability.

Joe Goffman is committed to fair outcomes, even if that process takes longer than many of us who support stronger, commonsense clean air regulations would like.  Why is that the case?  It is because he

cares about doing things the right way and listening to the concerns
of all who may be impacted by changes to our Nation's clean air
standards.

Don't just take my word for it.  Over 50 groups representing a
broad coalition of interest have voiced their support for Joe
Goffman's nomination to serve as Assistant Administrator.

As expected, these groups include some of our largest
environmental organizations, such as Natural Resources Defense
Council, NRDC, along with the Environmental Defense Fund, along with
the National Wildlife Federation, the Sierra Club, and the League of
Conservation Voters.  That is just a couple of the environmental
groups that have said they are for this nomination.

It is important to note, however, that a diverse array of
industry groups also support Joe Goffman's nomination, from utility
organizations like the Edison Electric Institute, EEI, to biofuel
groups like the Renewable Fuels Association.

Finally, Joe Goffman's nomination has the support of some of our
Nation's largest labor unions, including the AFL-CIO and the United
Steel Workers.  Even the United Mine Workers of America, our Nation's
largest union of coal miners, have voiced their support for Mr.
Goffman's nomination to lead the Office of Air and Radiation.  That
does not happen every day, and it bears testimony to Joe's character
and commitment to doing what it right.

While much has changed since Mr. Goffman last appeared before
this committee nine months ago, including the passage of the Inflation
Reduction Act, the growth of clean energy manufacturing jobs in our

Nation, and the lowest unemployment rate since 1969, the strong and diverse support for his nomination has not wavered.

President Biden selected Joe Goffman to lead this office because he knows that Mr. Goffman is up to the task. Having worked with Mr. Goffman, I know he is well-prepared for this role, and I look forward to doing my part to advance his nomination without undue delay. He has the heart of a public servant. We look forward to hearing from him today.

Before we do that, I want to turn to our Ranking Member, Senator Capito, for her opening remarks. Senator Capito?

[The prepared statement of Senator Carper follows:]

STATEMENT OF THE HONORABLE SHELLEY MOORE CAPITO, A UNITED STATES
SENATOR FROM THE STATE OF WEST VIRGINIA

Senator Capito.  Thank you, Mr. Chairman.  Thank you.  I value
our partnership as we consider the nominees.  Although we are not
always voting the same way, I take this seriously, the processing of
the nominations.

I want to thank Mr. Goffman for coming before us again today.
Welcome back and thank you for being here.

We have some new members on our committee, as you see, who
haven't had a chance to face-to-face with you, Mr. Goffman.  I think
that is important in light of the discussion today.

So, you have been at the Administration within the Office of Air
and Radiation.  According to the Chairman, you have done a lot of work
throughout the course of your career, but your last hearing was in May
2022, and as the Chairman mentioned, a lot has changed, really, three
major events that apply directly to the Air Office's responsibilities
and authorities since we last saw you, the first being the Supreme
Court landmark decision in West Virginia v. EPA, a case successfully
led by my home State.  There, the Supreme Court held that the Clean
Power Plan was an illegal overreach of EPA's authority.

When Congress wishes to vest agencies with broad authorities,
like the authority to fundamentally change our Nation's energy sector,
Congress speaks clearly.  Congress does not address major policy
questions through silence or ambiguous grants of authority.  There are
no elephants hiding in mouse holes.

Given the significance of what the Supreme Court established

there, I must say, I was a bit surprised when you told the New York Times in an interview not long after that decision, that "this case does not really take anything off the menu that we have been focused on."  That concerns me and I am sure it is no surprise to you that it did, especially that you have given personal calls for capacious readings of the Clean Air Act authority before the Supreme Court's ruling and prior defeats in our Nation's highest courts.

If nothing has changed, does that mean that you intend to continue to interpret the Clean Air Act in these overreaching ways? That will be the substance of part of my questioning.

Second, another significant event since your last hearing was the passage of the Inflation Reduction Act.  As predicted, that bill has failed in achieving its titular purpose, as inflation remains stubbornly high, but then, in my view, it was never really about inflation, but about funding partisan priorities.  What proponents have said, accurately, is that it is designed to have a significant impact on our baseload power resources in this Country, especially our coal resources.

In a recent presentation, the staff from the EPA Office of Air and Radiation discuss some of the initial findings that EPA has made about the effects of the IRA, Inflation Reduction Act, on coal power plants moving forward.  The EPA staff confirmed that the legislation will drive down the deployment and use of coal and power plants at a significant rate.

The charts behind me, these are charts from the EPA presentation, shows exactly that.  The blue line in the graph shows anticipated use

of coal power without carbon capture, CCUS, between 2020 and 2040. The blue line shows, also, I have the other chart here right now, but the red line with the IRA is noticeably lower.

On the other chart it is the same on the capacity.  This is capacity, and coal capacity means how much they are running, I think. No, the second chart shows the capacity factor, so let us put that one back up.  This is how many will be in production.  The second shows that, in other words, how much will these be in service.  Because of the IRA, not only will more coal plants retire, but the usage of those still in service will be much lower.  You have the charts, I know, because our staffs have talked about this.

To translate what these charts mean in real-world terms, your agency is predicting the IRA itself will drive significant decreases in coal usage.  For West Virginia, what that means is further hits to communities devastated by policies that were previously put into place.  You and I have talked about this.  This leads to job loss, poor health, drug addiction, hopelessness, but the graphs we are looking at only consider the Inflation Reduction Act.  That is not the end of the line of the Administration.

As we know from your presentation in February of 2021, you have been a critical advisor in the development of the Administration's so-called EGU strategy, a plan to dump a number of new regulations across the air, water, and waste categories to disproportionately affect our coal power.  The effects of these regulations, like the replacement to the Clean Power Plan, the new effluent limitation guidelines under the Clean Water Act, and the so-called Good Neighbor rule, will further

hit coal plants in our industrial heartland.  The Inflation Reduction

Act is bad news for coal communities in West Virginia and, I think,

devastates us.

I have mentioned West Virginia v. EPA.  I mentioned the Inflation

Reduction Act.  The third item of concern is the warnings being

sounded by the grid operators.  We have a reliability problem in this

Country already, and it is going to be gravely exacerbated by policies

that drive away critical baseload energy resources like coal and

natural gas.  These regulatory policies will likely render

unachievable the Administration's goal to electrify certain industries

that currently do not depend on the grid, such as automobiles or gas

ranges, as grid operators struggle to fill current, never mind future,

demand.

Earlier this week, the Wall Street Journal editorial board wrote

about the types of policies that are driving power plant retirements

and how those plants are shutting down without adequate replacement

power.  They cite a report released last week, excuse me, by PJM,

which serves more than 65 million people across 13 States, including

the District of Columbia where we are, and also the State of West

Virginia, where I live.

PJM is ringing the alarm about the effect that retirements will

have and how most power plants retirements are policy-driven.  This is

a quote from their report: "Policies like an EGU strategy could lead

to energy shortages and blackouts."  As the Journal observed, "the

steep costs of complying with EPA agency regulations, including a

proposed Good Neighbor rule that is expected to be finalized next

month, will force the shuttering of 10,500 megawatts of fossil fuel
generation."

So, I am going to request unanimous consent that the editorial,
the PJM report referenced here, and the EPA presentation, which I have
here, and I have the full presentation here, be put into the record.

Senator Carper.  Without objection.

[The referenced information follows:]

Senator Capito.  That will be the substance of my questions. Thank you again for being here.

[The prepared statement of Senator Capito follows:]

Senator Carper.   Thank you, Senator Capito.

Before I turn to Mr. Goffman for his testimony, I ask unanimous consent to submit for the record a letter of support for Joe Goffman's nomination from the United Mine Workers of America.   Senator Capito knows that my sister and I were born and grew up in West Virginia for part of our lives.   A bunch of our neighbors were coal miners, and they were members of the United Mine Workers.

It is interesting to me that one of the principal endorsements that you have gotten for your nomination is from the United Mine Workers of America, a diverse union with membership that includes coal miners, manufacturing workers, clean coal technicians, health care workers, corrections officers, and public employees.

I also ask unanimous consent to submit for the record testimony from our colleague from Pennsylvania, Senator Casey, in support of Mr. Goffman's nomination.   I ask unanimous consent.   Is there objection? Hearing none, so ordered.

[The referenced information follows:]

Senator Carper.  Senator Casey, as you know, is bouncing back. He is off the DL, the disabled list.  He is back in the lineup.  He can't be here this morning, but we are happy that he is healthy again. We wish he could be here in person to support his fellow Pennsylvania native, but in his absence, let me share some of his thoughts on Mr. Goffman.

I will just say something.  I won't quote Bob Casey at length. Here is part of what he said in his testimony: "I know that Joe views public service as a privilege and an honor.  He has dedicated his career to environmental laws and policy aimed at safeguarding and improving American's health and prosperity.  That is what motivates him to do his work, and that is what makes him a most qualified nominee for this important position."

With that, let us turn to Mr. Goffman.  We thank you again for being with us today.  We thank your wife for sharing you with us as a Nation and our committee today.

Mr. Goffman, you are now recognized for your opening remarks. Please proceed.  Thank you.

STATEMENT OF JOSEPH GOFFMAN, ASSISTANT ADMINISTRATOR, OFFICE OF AIR
AND RADIATION AT THE ENVIRONMENTAL PROTECTION AGENCY

Mr. Goffman.  Thank you very much, Chairman Carper, for that
extremely generous introduction.  Thank you very much, Ranking Member
Capito, for outlining issues that I think we both agree are extremely
important to be able to focus on.  It is great to have the opportunity
to do that.

It is indeed a privilege to appear before this committee this
morning.  I am humbled to be nominated by President Biden and
considered by the committee for the position of Assistant
Administrator for the Office of Air and Radiation at the United States
Environmental Protection Agency.  I am also grateful for the honor and
opportunity to continue my public service, having previously worked
for the members of this committee in four different positions between
1989 and 2017.  Being here before you today, again, is truly an honor.

Joining me here today is my amazing wife, Antonia.  Thank you,
Senator, for introducing her.

Senator Carper.  Antonia, raise your hand, so we will know which
one is the wife.  You all could be triplets.

Mr. Goffman.  Watching this hearing from their home in San
Francisco, New York, and Los Angeles are my three children, Gabriel,
Genevieve, and Olivia.  As I said to them a year ago, when I was here
last, I want them to know how very much I love them, and I admire them
for leading lives that reflect the values their grandparents gave to
me, values that I have carried with me and relied upon all my life.

Like too many Americans, I grew up in a household that struggled

financially.  There were months-long periods when my father, who lost

two businesses, was unemployed, and my family could barely afford even

the basics.  As a child, I felt the pressures of my parents' money

worries acutely.  For me, protecting businesses and jobs and keeping

money in the pockets of hard-working Americans is still very personal.

College was out of the question unless I worked hard enough in

school to gain scholarships and financial aid, and hard enough after

school and over summers to earn the rest.  That meant working as a

stock boy and janitor's assistant in a department store during high

school and in a union job as a line worker in a corrugated box factory

during college.

Besides giving me a strong work ethic, my parents insisted that I

put the highest value in doing good, and with the civil rights

movement gripping their and my own young admiring attention, the

lesson that I took away was that every person, including me, was

responsible for making our society more just.

Working for the committee in 1989 and 1990 gave me the chance to

do that in drafting the acid rain provisions of the Clean Air Act

Amendments of 1990, which succeeded in achieving substantial power

plant pollution reductions at the lowest possible cost to businesses

and consumers while ensuring cleaner, healthier air for our children

to breathe.

This bipartisan legislation worked because it was grounded in

science and crafted with the input and participation of utilities

themselves.  Since then, I have made it my business as a Senate

staffer and as an EPA appointee to prioritize engagement with all

stakeholders, from frontline communities to workers to businesses, and to listen proactively, learn from others' experiences, and reflect their concerns in my work.  My goal has been and continues to be crafting smart, durable policy that protects the environment and people's health while enabling our economy to thrive and American innovation to flourish.

The range of perspectives was critical to three other pieces of legislation that this committee helped enact: the AIM Act, the Bipartisan Infrastructure Law, and the Inflation Reduction Act.  EPA is meeting the deadlines this committee set in the AIM Act to phase down HFCs and enable American industry to lead the world in innovation.  We are putting infrastructure dollars to work in communities across the Country, awarding nearly $1 billion in Clean School Bus rebates to over 400 school districts spanning all 50 States, Washington, D.C., and several Tribes and U.S. territories. Under the Inflation Reduction Act, we are working quickly to tackle the climate crisis and secure environmental and economic benefits for all people.

Laws like the Bipartisan Infrastructure Law and the AIM Act show that when we work together, strive to reach common ground, and bring all stakeholders to the table, we can deliver strong, impactful results for the American people, results that will provide untold benefits for our health, our economy, job creation, and the environment.  If confirmed, I will approach all our decision-making through the same lens and with the integrity, transparency, and accountability that Administrator Regan insists on.

Members of the committee, like you, I hold the belief that all Americans, no matter where they live or what they do for a living, deserve clean air to breathe, clean water to drink, a secure job, and healthy, safe communities in which to raise their families.  It would be a distinct privilege to work alongside and support EPA's brilliant and selfless civil servants in this shared mission.

Thank you for the privilege of speaking to you today.  I look forward to hearing your concerns and answering your questions.

[The prepared statement of Mr. Goffman follows:]

Senator Carper.   Mr. Goffman, thank you very much for those comments.

We are now ready to begin with questions for our witness. Senator Capito and I have agreed to two five-minute rounds of questions, with additional rounds at the discretion of the chair. Again, this committee has three standing yes or no questions that it asks of all nominees who appear before us, so I am going to ask those three questions today.

The first one is, do you agree, if confirmed, to appear before this committee or designated members of this committee and other appropriate committees of the Congress to provide information subject to appropriate and necessary security protections with respect to your responsibilities?  Do you agree?

Mr. Goffman.   I agree.

Senator Carper.   That is a good answer.  Next question is, do you agree to ensure that testimony, briefings, documents, and electronic and other forms of communication of information are provided to this committee and its staff and other appropriate committees in a timely manner?  Do you agree?

Mr. Goffman.   I agree.

Senator Carper.   Good.  Finally, do you know of any matters which you may or may not have disclosed that might place you in a conflict of interest if you are confirmed?

Mr. Goffman.   I do not.

Senator Carper.   Good. We are three for three.  With that, we are going to start with the questions.  I am going to lead them off, and

then yield to Senator Capito.

As I mentioned in my opening statement, you have a history of being honest and fair.  It sounds like hard work, even as a kid, during your long tenure in public office.  I see we have a couple of our new members that are joining us today.

It is rarely that I have seen such broad support from not just environmental groups and not just from industry, but from labor for one nominee, regardless of party.  We have seen it today.  I must say, I am surprised and frankly, pleased.  I can't remember a time when the United Steel Workers, Earth Justice, Fertilizer Institute, and American Forest and Paper Association all agreed on one thing, yet they seem to agree that you should be the Assistant Administrator for Air and Radiation at EPA, and for me, that is encouraging.

I want you to begin by telling us about one or two things you have done or been involved in over your career that make you most proud, and how did these things help shape who you are today and the type of leadership you will be, if confirmed?  Go right ahead.

Mr. Goffman.  That is a really generous question to ask, Senator Carper.  It is a very generous question to ask, and I hope you don't mind if I answer it a little bit indirectly.

I think what speaks to your question are two things.  One is the extremely broad support that you just laid out that I have received from a number of interests.  I think you heard, or I tried to convey in my opening statement, my understanding of the values and ideals that public service represents, or at least represents to me.  I hope that the broad and diverse support that I have gotten for my

confirmation is evidence that others see the work that I have done over the years and the way in which I have attempted to conduct it is reflected in that support.

Of course, having been nominated by President Biden twice for this role, while serving in the Office of Air and Radiation, I hope that means that the President made this nomination because it reflects his appreciation of the work of the Office of Air and Radiation while I have been there.

I certainly found that my time working on this committee, particularly during the enactment of the Clean Air Act Amendments of 1990, which was a vigorous bipartisan accomplishment, probably made an enormous imprint on the way I conducted business or have tried to conduct business as a public servant ever since.  Because it was bipartisan, because the leadership of the committee at the time and of the Senate and the House was so committed to engaging with all interests and ensuring that ultimately, the Clean Air Act Amendments of 1990 not only delivered meaningful pollution reduction, meaningful improvement in air quality and public health, but at the same time, allowed those things to be achieved while the economy continued to grow and jobs continued to be plentiful and good.

Senator Carper.  Thank you.  Clean air is essential to human health, as we know.  Unfortunately, far too many Americans are breathing air that is unhealthy, and that burden is not evenly shared. Too often, our most vulnerable and underserved communities suffer the most from harmful air pollution.  We need strong air pollution standards and Federal investments to help reduce emissions in these

communities, too.

That is why I am particularly proud of the Bipartisan Infrastructure Law Clean School Bus Program, which EPA is implementing under your leadership.  This program provides, I think you mentioned, $5 billion to accelerate the transition of millions of dirty school buses to cleaner buses.  The Clean School Bus Program is cleaning up communities and protecting our most vulnerable from being harmed as they ride the bus to school.

Question: would you please take a moment, again, and expand for us, describing how the implementation of the Clean School Bus Program is going, how is it going, and second, is it my understanding that EPA has already provided funding for Clean School Buses in every State in the Country?  I think you said that.  I just want you to reconfirm that.  Go right ahead.

Mr. Goffman.  Thanks, Senator Carper.  The Clean School Bus Program, I think, is one of the many great accomplishments of this Congress working in a bipartisan fashion, and certainly of this committee.  Yes, we have delivered close to $1 billion in rebates for clean school buses in 400 communities in 50 States, plus Washington, D.C., plus Tribal areas and territories.

I think it would be maybe most revealing to just picture what that means for the communities and neighborhoods that are now getting to use non-emitting school buses instead of school buses that sometimes had been using diesel fuel and diesel engines.  It means that kids getting on the bus, bus drivers, parents waiting with them at the school bus stop, the people who work, teachers and others who

work in the schools, are all, in a very immediate way, enjoying the benefits of cleaner air in their everyday routines.

That is going on across the Country.  Congress provided $5 billion for that program.  We have given out $1 billion.  That means that the lessons we learned last year in implementing that first round of rebates can be applied for the next three or four rounds of distributing these funds to communities across the Country.

Senator Carper.  Yes.  My colleagues know that I go home most nights to Delaware, something our President used to do years ago. About three or four days a week, I drive in the morning to the train station to catch a train to get down here and come to work.  School buses are out.

Basically, they are out on the streets early, before 7:00 o'clock in the morning.  I see a bunch of kids, one stop after the other, at a train station waiting for the buses, and the buses pull up, and they are all diesels.  They are all diesels.  What those kids are breathing is probably not good.

One of the things that we have done as a Congress is to provide the resources to help change that.  I think that is something we could celebrate together.  Thank you.  With that, Let me turn to Senator Capito.  Then Senator Cardin is next.  Senator Capito?

Senator Capito.  Yes, thank you, Mr. Chairman.

I want to go back to the charts that I spoke about in my opening statement.  You can see, on the coal capacity, the blue line would be what is predicted to be the retirements, and then with the IRA, you see drastically, by 2040, many, many more.  On this one, this is how

much of those plants running, the ones that are remaining, you can

see, with no IRA, close to over 50, post-IRA, looks like 15 to 18

percent.

Do you agree with the conclusions that were drawn?  These were

made by your office of Air and Radiation staff recently and presented

at a conference.

Mr. Goffman.  Thanks for that question, Senator.  I believe that

the model that we developed and the run that we did to produce these

results was solid and methodologically sound.

Senator Capito.  Okay, yes.  Thank you.  There is also, which I

don't have the larger charts for, but natural gas that has the same,

not as dramatic, but the same post-IRA implementation drastically down

in generation and also in capacity factor, so same thing for natural

gas.

I have talked to you about this, and you emphasized a lot in your

opening statement how you started and the kind of community that you

were in and how difficult it was for you to go through joblessness of

your father.  This is what our communities, my communities, are going

to be seeing and have seen, and more drastically over the next 20

years.

Are you concerned about the number of jobs that would be lost in

this if these projections are correct, and are you taking that into

consideration at every step of the way as you are putting forward your

regulations?

Mr. Goffman.  Senator, that is one of the central questions  that

we always have before us, which is how to establish standards for, in

this case, the power sector that reduces pollution while preserving economic opportunity and jobs.

Senator Capito.  How does this preserve jobs?

Mr. Goffman.  I am sorry.  The Inflation Reduction Act, as you know, as well as the Bipartisan Infrastructure Law, distributes investments across a great many sectors of the economy.  What those charts look like, I think, to someone like me, who has worked in the Office of Air and Radiation on a number of rules and worked with expert staff who do this kind of modeling, we concluded when we did this analysis is that this was an illustrative case.

One of the things we tried to communicate in the presentation that went along with these charts is that what the Inflation Reduction Act did was to give utilities a wider range of choices as to the kinds of fuels and technologies they could look to in generating electricity going forward.  A computer model is not a utility.  A computer model does not make decisions.  Communities make decisions.  Utility regulators make decisions.  Utility investors make decisions, and of course, the utilities themselves do as well.

Senator Capito.  Right.  I am going to stop you.

Mr. Goffman.  I think, when you consider that what the IRA has done has opened, again, a range of choices or broadened choices to include more cost effective, say, renewable energy options, we have a long way to go as decision-makers and as policy-makers before we know what has happened and before we can ultimately influence what is going to happen.

Senator Capito.  Thank you.  I think that is a longer explanation

of not saying that it is a lot of job loss here on both these charts, and the ones with the natural gas, but let me ask you this.

Let us get to the reliability factor.  You are retiring, and through your regulations, your Good Neighbor Policy.  The Midcontinent Independent System Operator, which is another regional operation, says that this creates significant concerns about MISO, which is their acronym, ability to maintain electric reliability.

So you take all of this off, and the natural gas that is in your presentation as well, how are we going to power a Nation with this and meet the demands of electric cars?  We are not going to be able to do it with what we are seeing.  We can't permit anything, so that is a problem.  So, where does this leave us, as a Nation, as being able to power our Nation?

Mr. Goffman.  Senator Capito, I appreciate that question, because reliability is another one of the central questions in front of us whenever we propose power sector rules.  Before we even began the current round of developing rules, we engaged in extensive outreach across the Country and across the utility sector, including with PJM, MISO, and other grid operators.

When we proposed the Good Neighbor Plan, a number of those parties, including PJM, the author of the most recent report, came back to us and pointed out the ways in which they had concerns about how the Good Neighbor Plan proposal would affect reliability.  As we are developing the final rule, we are making changes to reflect and address those very concerns that have been raised about the ongoing reliability of the grid.

Senator Capito.  I guess the timer has gone off.  Thank you, Mr. Chairman.

Senator Carper.  Thank you, ma'am.

A quick thought, Senator Capito.  When I drove to the train station today, I went by all these buses, school buses, that over the years to come are going to be converted to electric vehicles, and that is actually happening.  I went by DART buses, Delaware Authority Regional Transportation, they are also being converted to electric buses.

Across the river from where I live, in New Jersey, there is a nuclear power plant that is not going to live forever, not going to last forever.  If we are smart, we will be able to help them stay in business and can continue to provide carbon-free electricity.  There are a bunch of things we can do.  I wake up every day as a recovering governor thinking about, how are we going to make it possible for people to go to work and have jobs in the future.  There is opportunity here.

Not everybody likes carbon capture and sequestration.  I think that is a part of the solution.  I know you do, as well.  It is just one of many things that we can do.  It is not just enough to clean up our air and address the climate change and so forth.  We have to make sure that when we do that, we put people to work, and they have good jobs that they can support their families, so I think we all agree on that.  Thank you.

I ask unanimous consent to enter into the record an August 2022 report from the Rhodium Group, an independent research organization,

that is entitled A Turning Point for U.S. Climate: Progress Assessing

the Climate and Clean Energy Provisions in the Inflation Reduction

Act.  According to this report, the Inflation Reduction Act cuts

household energy cuts, cuts household energy costs, by up to an

additional $112 per household on average in 2030 than without the law,

cuts electric power conventional air pollutants by up to 82 percent

compared to 2021, and scales clean generation to supply as much as 81

percent of all electricity in 2030.  Is there objection?  Hearing

none, so ordered.

        [The referenced information follows:]

Senator Carper.   Senator Cardin, you are on.   Thanks.

Senator Cardin.   Thank you, Mr. Chairman.

Mr. Goffman, thank you for your willingness to serve and continue to serve in this very important public position.   We thank your family for sharing you with us.   I want to talk about what States are doing. We have seen States that have been very aggressive in dealing with air quality.   In my own State of Maryland, the Climate Solutions Now Act, provides for reduction of greenhouse gases by 60 percent compared to 2006 by 2031, and for Maryland's economy to reach net-zero emissions by 2045.   That is very aggressive.

The Inflation Reduction Act, great commitment at the national level, but our States are even moving more aggressively on air issues, air quality issues.   Maryland is not alone.   Other States are also doing this.

My question is, how can the Federal Government help our States reach those types of goals when they are being more aggressive than required under any of our Federal regulations?

Mr. Goffman.   Thank you for that question, Senator Cardin, and for the inspiring news about what Maryland is doing in exerting leadership.   Speaking as a long-time Clean Air Act lawyer, I can say in some ways, that is what is supposed to be happening, in which the States are not only partners in making policy and very often, they are the leaders, whether it is States like Maryland or California.

Right now, we have in the opportunity created by Congress on the Inflation Reduction Act to provide financial support to States and municipalities that, for example, are putting in place, developing and

implementing programs to reduce carbon pollution.  In fact, just this morning, the agency announced new guidance for how States and municipalities can apply for planning grants to prepare themselves to apply for even more generous grants later this year to support the kind of work that Maryland is doing.

So, while I don't know that we can catch up in the near future to the ambitious goals that Maryland has established, we can, thanks to Congress, provide material and financial support to States like Maryland and cities and communities in Maryland.

Senator Cardin.  The Chairman and Ranking Member and this Senator have something in common.  We are all part of the Chesapeake Bay watershed.  Your responsibilities in air quality have a major impact on our efforts and our commitments in regards to the Chesapeake Bay.

Tell me how you work with Region 3 and the Chesapeake Bay commitments that have been made where EPA is engaged in so that your work is coordinated with the strategies that we are using on the Chesapeake Bay.

Mr. Goffman.  Thank you for the opportunity to talk about that. The biggest contribution that your Office of Air and Radiation can make to the Chesapeake Bay is reducing airborne NOx pollution that ends up as NOx deposition in the Bay.  What we do when we work with the Chesapeake Bay States, when we work with Region 3, is contribute, if you will, sort of the background improvement in the NOx situation so that as different pollutants that are delivered through water runoff or through other, more immediate sources are addressed, we are doing our best to take care of the NOx problem.

That is why the heavy-duty NOx rule that we finalized at the end of last year can play such an important role.  The Good Neighbor Plan itself also targets NOx reductions from the power sector and the industrial sector.

Senator Cardin.  The MATS program dealing with the mercury issues, can you just briefly talk about how that program has been effective in dealing with some of the issues, including the Chesapeake Bay?

Mr. Goffman.  The Mercury and Air Toxics Standards that EPA adopted about 10 years ago have achieved somewhere north of 80 percent reductions in mercury from the power sector.  We are looking to propose, if you will, a follow-up rule that targets, among other things, any additional cost-effective mercury reductions that are still available.

We believe that, if and when we do propose additional reductions in mercury emissions, we can point to the MATS rule, we can point to its success, we can point to its ultimate affordability to utilities and electricity ratepayers while also having achieved significant mercury reductions as a basis for an additional proposal.

Senator Cardin.  Thank you.  Thank you, Mr. Chairman.

Senator Carper.  Thank you, Senator Cardin.

I want to make another unanimous consent request, if I could.  I ask unanimous consent to submit into the record a letter from a major utility's trade and labor organization into the record, a letter from a major utility trade and labor organization in support of full implementation of the 2012 Mercury and Air Toxics Standards.

The letter states that the upgrades to power plants under these standards reduced mercury and other air toxic emissions by nearly 90 percent at a quarter of the estimated cost.  Let me say that again: reduced mercury and other air toxic emissions by nearly 90 percent at a quarter of the estimated cost.  Every power plant in the Nation in compliance by 2017.  This rule was implemented without any blocked counsel brownouts.  That is worth us keeping in mind.

[The referenced information follows:]

Senator Carper.  Okay, I think we are going to turn next to Senator Cramer.  How are you doing?

Senator Cramer.  I am doing great, and I would never object to you.  Even if you don't ask.

Senator Carper.  I love to do unanimous consent requests when I am the only one here.

[Laughter.]

Senator Carper.  I am the only one who can object, and I never object to my own unanimous consent requests.

Senator Capito.  That is good.

Senator Carper.  Senator Cramer.

Senator Cramer.  Thank you, Mr. Chairman, and thank you, Mr. Goffman, for being here and for your willingness to continue to serve. Actually, this most recent unanimous consent request raises a really important point.  I was a utility regulator through a lot of the SOx, NAAQS, mercury particulate matter reductions.

And guess what we did in those days?  We had cooperative federalism where the Federal agencies and the State agencies and the stakeholders were all in it together.  They spent millions and millions of dollars to make these upgrades for the benefit of the people we serve.  And we didn't have what we see today.

Which brings me to my first point and question that I wanted to raise with you.  As a strong advocate for cooperative federalism, I think we are missing the opportunity.  I am going to go back to something you and have I talked about before, and that was your proposed clean power plan rule back in the day that would have

required North Dakota to reduce its emissions 11 percent.

Now, we weren't crazy about that, and our stakeholders weren't crazy about it, but we knew it was doable, and we were willing to do our part.  Then when the final rule came out, it was 400 percent greater than the 11 percent, the bait and switch that I have talked about before.  And at the 45 percent, which was absolutely, it was federalism the way it is not supposed to be done.

The last time you were here, which was May of last year, so nine months ago, I asked you a question about working with my State regulators, the three public service commissioners, our DEQ director.  You said something to the effect that, I am glad you asked that, because I was going to ask you for the contact information so we could reach out.

I reached out to them last week.  In the last nine months they have not heard from you or anybody in your shop to talk about the replacement rule.  Are they wrong?  Did they just forget?  Or did you forget?  Could you clear this up for me?

Mr. Goffman.  Thank you for pointing that out, Senator.  I have to say I am disappointed in myself in not having ensured that we made those contacts.

But I hope you and your colleagues in North Dakota are willing to go with better late than never.  We are going to be moving forward with, as I mentioned to Senator Cardin, a proposal to address mercury emissions in the power sector.  We expect to be moving forward later this spring with a proposal to address CO2 emissions.

What I anticipate we will do, and now that you have brought this

up, I will make sure we will do, is as those proposals are being
publicly shared for comment, well before we finalize them, we will
engage directly with your colleagues in North Dakota.

Up until this point, a number of senior people in the Office of
Air and Radiation have engaged in lots of discussions across the
Country  I think I may have mentioned to you last time that we have
engaged with utility commissioners through NARU.  I believe when
Senator Capito and I were talking about reliability, I mentioned we
also spent a lot of time talking to grid operators.

I had hoped in that casting of a very wide net we had captured an
opportunity to talk to --

Senator Cramer.  Well, you didn't.  But cooperative federalism
needs to be more deliberate than reaching out to NARU.  I was a member
of NARU for half of my term; I was always a member; I just came to the
realization that they tend to gravitate to the lowest common
denominator and then having nice meetings.  I think you need to reach
out; you can't just talk to people you agree with.  That is my sense,
is you are not talking to people who do this every day.

But all that said, quickly I do want to address another problem,
or potential problem.  That is the methane rule, the proposed methane
rule.  North Dakota has stricter requirements than any Federal rule,
but it does require doubling the paperwork.  In fact, in North Dakota,
our methane, of course, is a byproduct of oil production.

So flaring is one of the viable, not the ideal, of course, method
of dealing with venting.  But 95 percent of ours is captured on State
and private land, 59 percent on Federal and tribal land.  In other

words, North Dakota's excellence doesn't really want to yield to Federal Government mediocrity.

I will just wrap up and we can get deeper into it in the next round.  But again, cooperative federalism would go a long way if you didn't impose new restrictions on the excellent States but rather worked with to maybe empower them a little more at the local level, and you might get a better outcome.  The problem is, Senator Capito raised the issue of permitting.  Well, permitting is the problem on Federal lands, the permitting of the takeaway capacity for what is now being flared, wasted.

Maybe in the next round we can drill down a little more on that one, Mr. Chairman.  Thank you.

Senator Carper.  Good.  Do you want to respond very briefly to that?

Mr. Goffman.  Just to say that I remember Senator Cramer citing the performance of operators in North Dakota, both on private land and in public land in terms of efficiency and avoiding methane escape, methane leaps.  One of the things we are trying to do with the Federal rule is raise the floor for everybody else.  In many ways, our proposals are based on successful practices that are already in place in States like North Dakota.

Senator Carper.  Yes.  Thank you, Senator Cramer.  Thank you for bringing your expertise and knowledge from a previous part of your life to this body.  Thanks so much.

Senator Lummis, welcome.

Senator Lummis.  Thank you, Mr. Chairman.  Good morning to you as

well.

Mr. Goffman, in 2015, EPA officials working on the ozone transport rule stated that it was not appropriate to extend that rule to western States due to differences in topography, climate, wildfire prevalence and other factors.  They even indicated that they would work with western States on a case by case basis with respect to this rule.

But this Administration has decided to ignore that approach, and instead proceed with a one-size-fits-all approach with your new ozone transport rule.  So what factors have changed between now and 2015 to warrant this drastic change in approach?

Mr. Goffman.  Thanks for that question, Senator Lummis.  One of the things that we do is continually update our air quality modeling. In fact, since we met last in May, we have done another update, along with having met with Governor Gordon and his environmental staff in a meeting that Administrator Regan led and that I was able to participate in.  Since then, we have done yet another update in our modeling.

One of the results of that is that while, when I was here last time, we had proposed to disapprove of Wyoming's ozone transport implementation plan, when we made final decisions in January, we did not finalize that disapproval.  It is usually, it is the basis of the disapprovals that allows us to move forward or requires us to move forward with Federal Implementation Plans.

So in a way, the process of air quality modeling changes on a continual basis, so that since last, not just since 2015, but since

the last time we spoke, we have done another update, we have had
additional engagement with the State.  Our proposed disapproval based
on previous modeling we are not finalizing, at least for Wyoming.

Senator Lummis.  Yes.  But here is the problem.  You are
finalizing Federal Implementation Plans on almost all other States,
and denying State Implementation Plans.  We just assume that you are
going to eventually deny ours and do a Federal Implementation Plan,
because that is your M.O.

So for example, Governor Gordon, with a couple other governors,
sent a letter just a few months ago outlining these concerns.  The
governors stated because EPA proposed Federal Implementation Plans
before acting on the State Implementation Plans, EPA eliminated the
opportunity for early, meaningful, substantive and ongoing
consultations with the States.  This is a vast majority of this
Country in terms of geographic areas.

So how is this concern being addressed by EPA?  Can we just plan
in Wyoming on, oh, we will wait until December of this year and then
we will go with a FIP?

Mr. Goffman.  That is not our approach.  As I said, the
information we got, at least about updated air quality modeling with
respect to Wyoming, guided us in a different direction.  Having used
one set of information and modeling to propose to disapprove the State
Implementation Plan, subsequent modeling that we did and subsequent
discussions we had with Wyoming and the Governor and the Wyoming
environmental regulators took us in a different direction.

What I am trying say, Senator, is we actually do try to follow

the data and the modeling and the analysis where it takes us.  In this particular case, our own updated modeling and dialogue and interaction with the State took us in a different direction from the one we were going a year ago.

Senator Lummis.  State plans need, as my colleague from North Dakota said, cooperative federalism means State plans should have equal consideration to Federal plans.

I have more questions, but I will wait for the next round.  Thank you, Mr. Chairman.

Senator Carper.  Thank you for those questions.

We have been joined by Senator Markey.  If no one else shows up in the next five or ten minutes after he has asked his questions, Senator Mullin, you are going to be recognized for your questions, then Senator Ricketts.  Senator Markey, please.

Senator Markey.  Thank you, Mr. Chairman, very much.

Mr. Goffman, first I want to thank you for your years of public service in the Senate and in the Executive Branch.  There is an urgent need to act on climate change and make sure everyone everywhere gets to breathe clean air.  It is more important than ever to have experienced, talented, committed people serving our Country.  So thank you so much.

Strong vehicle emissions standards will be critical if we want to tackle the climate crisis, cut pollution, save drivers money at the pump and create jobs.  To keep moving down the road to a safer, healthier, more affordable future, we need strong rules for light and heavy-duty vehicles for model year 2027 and later.  And we need to

keep our foot on the accelerator.

That is why Senator Padilla and Representatives Matsui and Clark and I sent a letter to the EPA calling for the rule to be issued and finalized before the end of the year and made as strong as possible.

Mr. Goffman, if confirmed, will you work to swiftly issue and finalize strong vehicle emission standards to protect public health, the climate, and drivers' budgets with model year 2027 and beyond, and to get those done before the end of the year?

Mr. Goffman.  Right now, we are planning to propose ambitious car and truck standards, at this point, in a matter of weeks.  That puts us on a schedule where it is in reach to finalize those standards, certainly the truck standards, by the end of this year.  Our goal is to finalize the car standards as soon thereafter as possible.

Senator Markey.  That is very good news.  Thank you.

Americans will be able to breathe easier once we confirm a strong head of the Office of Air and Radiation.  I am pleased that the EPA is currently strengthening the National Ambient Air Quality Standards which keep smog out of our air and out of our lungs.

Mr. Goffman, if confirmed, will you work to update our air quality standards to reflect the most up-to-date science to ensure all communities are protected to the greatest extent possible?

Mr. Goffman.  Yes, Senator.  That is what we are committed to doing.  That is what Administrator Regan is committed to doing.

Senator Markey.  Excellent.  And in addition to dirty, soot-filled air, environmental justice communities are exposed to multiple sources of pollution, whether it is from factories, power plants,

trucking centers, or other high-polluting activities nearby.  Black,
Brown, indigenous and low-income and rural communities have
experienced environmental injustice from toxic pollution like lead,
arsenic, benzene and mercury.  Any one of these chemicals is an
injury; being hit with multiple chemicals is an insult.

Mr. Goffman, if confirmed, will you work to include cumulative
impacts in EPA rulemaking and look at how multi-pollutant exposure
affects health, well-being and quality of life?

Mr. Goffman.  That is a question I really appreciate your asking
at this time, Senator Markey.  We are making a sort of agency-wide
push to address cumulative impacts.  Our colleagues in the Office of
Research and Development are developing scientific tools to do that.

In the Office of Air and Radiation, we are developing a new set
of analytic and mapping tools so that when we set, say, toxic air
emissions standards for certain industrial sectors, we can find a way
to take consideration of the cumulative effects of pollution on the
communities that might be affected by those standards.

Senator Markey.  I think that is the only smart way of looking at
it, how they all interact to create the harm, and as a result a plan
can be put together, which ultimately will reduce costs on those who
are going to have to make the changes, because they can see the
totality of the issues they are going to have to deal with.

Mr. Goffman, can you speak more about what activities are covered
under the Climate Pollution Reduction Planning Grants, and how can
eligible entities make the most of these opportunities?

Mr. Goffman.  Thank you, that is a super timely question.  I

think you probably know that within the last hour or so we released
guidance for States to apply for the purposes of applying for planning
grants under that program.  That is a non-competitive grant program
for which all 50 States are eligible up to $3 million per grant.

The purpose of that funding is to give States and localities that
States may be working with the ability to sort of plan the next set of
investments they want to make or programs they want to put in place,
then apply for more extensive resources to implement those plans.  We
will be issuing guidance on those implementation grant opportunities
later this year.

Senator Markey.  Thank you for your service, sir.

Senator Carper.  Thanks, Senator Markey.

Senator Mullin, welcome.

Senator Mullin.  Thank you, Mr. Chairman.

It is good to see you, sir.  I sure wish we would have had an
opportunity to speak beforehand.  You made a statement that you look
forward to working with all of us.  But I haven't heard from you, you
haven't reached out to me. I would love to sit down with you and have
these conversations, these questions I have for you, in a longer
setting.  Unfortunately, I only have five minutes.

So when I ask you a question, I am really looking close to a yes
or a no, and I don't mean to be rude, but I will cut you off if you
start going on.  They should be some questions that you should be able
to answer pretty quick.

Do you believe in a one-size-fits-all approach when it comes to
clean air or that you should work closely with the States in

developing your thoughts?

Mr. Goffman.  No, and yes.

Senator Mullin.  What do you mean, no and yes?

Mr. Goffman.  No, I do not believe that one size fits all, and yes, I think States are our partners.

Senator Mullin.  So how much do you take into consideration when you are looking at regulating the east coast versus the west coast, especially when you start looking at emissions for vehicles and taking into consideration that my wife drives an average of about 5,000 miles, literally a month, to take my kids back and forth to school because we live out in the middle of nowhere on a ranch, and it is an hour for her to get there and get back, versus an electric car, where an electric car is not feasible, we'd spend half our time on a charger?

Mr. Goffman.  One of the approaches we have been taking for a long time and we continue to take is to set standards in a way to give the --

Senator Mullin.  But wouldn't you think a State should be open to that, that the State should be one to make the standards for them, rather than having the east coast and the west coast make those decisions?  Because you mentioned California multiple times and PG&E, which is the Pacific Gas and Electric Company of California.  You start talking about their standards.  You have actually bragged on California.

Do you think California sets the gold standard for setting emission rules and electrical rules as far as energy costs and setting

the standard for clean energy and clean air?

Mr. Goffman.  From a technology perspective, California has been a leader.  But we --

Senator Mullin.  Okay, well, let's just stop on that.  So there is, they are a leader, right?  But yet they have the most unaffordable gasoline and energy costs, and they have rolling blackouts.  I had the dis-privilege of staying most of 2020 in California because of an accident my son had, and he was going through rehabilitation there. It was interesting to me that around 8:00 to 10:00 o'clock every night, during the hottest times of the year, they had rolling blackouts.

And they set them on zones.  And it was interesting because we talked about the dis-privileged neighborhoods, but yet it was the dis-privileged neighborhoods that always seemed to have the rolling blackouts, they set out the zones, right, where they are at, and the zones were rated depending on their importance.

They would have rolling blackouts, and they would set the time when those were going to hit.  Is that affordable and reliable energy? Don't you think that should play a cost when considering things?

Mr. Goffman.  It should --

Senator Mullin.  But yet California you think is setting the standard for us and you want to put their rules on Oklahoma?

Mr. Goffman.  I don't think we have the authority to do that, even if we wanted to.

Senator Mullin.  But if you are using California as a model and you are setting this rule, then you are forcing that on us.  And yet

that is a good plan.  PG&E can't even get a permit to upgrade their systems because of the environmental impacts supposedly it has.

So they have the most unreliable and some of that, all this transmission lines out there.  Yet you are using them as someone that says they support your policies moving forward?  And you think that is a bragging point?

Mr. Goffman.  I probably should have been more specific, Senator.  We --

Senator Mullin.  It is not specific.  We could have this conversation if you would just have reached out to me, and said let's have this conversation.  But it concerns me when you are going to be heading this agency specifically in this area and are talking about California as a gold standard.

I don't want California rules.  I don't want them to play a role in Oklahoma.  I want affordable and reliable energy.  I don't want to have rolling blackouts, to which we don't have rolling blackouts in Oklahoma.  I don't want them to make a decision on what neighborhood is going to be shut down and which isn't.

The irony of that, when they have rolling blackouts, it was funny because it was never the retail area.  It was never hospitals.  It was never the fire department or the police stations.  It was poor neighborhoods that was getting the raw -- and it was the same time over and over again.

And the irony of that, too, get this, you could set your clock to it.  Because when they had the blackout because they would announce when the time was going to be, right, wait 30 minutes and you start

hearing sirens.  Because the criminals also knew when the blackouts
were going to be and they started breaking into houses about the same
time.

And that is the energy policy you want for the rest of America?

Mr. Goffman.  Senator, I think we have a lot to talk about.  I am
going to make myself available.

Senator Mullin.  We have a lot to talk about, right.  Because
what I don't want you to do is force something on us.  If people in
California want to live that way, let them vote those people in and
let them make their decisions.  But you are representing the United
States, the Environmental Protection Agency of the United States.  And
your say should take into consideration what the States say, and the
States should have a bigger stake in it than you.  And you shouldn't
set a standard that is going to be across the board.

When you start talking about emission rules, that affects all of
us.  We haven't even talked about trucking, which I carry a CDL in my
back pocket.  I would love to have a longer conversation with you on
that, too.  I yield back.

Senator Carper.  I hope the two of you have an opportunity to
continue this conversation.  I think that is very much needed.

Senator Kelly, I believe you are next.  Thanks.

Senator Kelly.  Thank you, Mr. Chairman.

Mr. Goffman, good to see you again.  I appreciate your candor
during our previous hearing as well as your commitment to ensuring
that the EPA works with stakeholders in the State of Arizona to
address some unique air quality challenges that we face.

One particular challenge that we face in Arizona is ozone-forming pollution, particularly in Maricopa County, which is where Phoenix is. Most of the western United States, including Maricopa County, have background levels that are near the national air quality standard for ozone.  Unlike many other urban areas, Maricopa County doesn't have this long history of big smokestack industries.

So when it is time to attempt to meet the ozone emission targets, the county has to focus on some really non-industrial emission sources like smaller commercial facilities or vehicles.  This is important, because without identifying emissions offsets, new manufacturing facilities like our growing semiconductor industries, they have to figure out how can they be built and meet the emission standards without taking the whole county over the limit.  So it is important that we find solutions to reduce ozone emissions while enabling smart economic growth.

Fortunately, Maricopa County has developed some innovative solutions to this.  Mr. Goffman, are you familiar with two proposed emission reduction credit rules developed by Maricopa County called Rule 205 and 204?

Mr. Goffman.  Thanks for that question, Senator.  It gives me an opportunity to recognize that at EPA headquarters and EPA Region 9, we actually recognize Maricopa County as exerting real leadership and innovative approaches to the very problem or very challenge you talk about, which is what in Clean Air Act-speak is the offset requirement.

I am familiar with both 204 and 205, which are permitting offset rules.  I know my colleagues in Region 9 are very familiar with those

rules.  Right now, we are looking at the approval review for 204.  I think as a technical matter, we don't have 205 in front of us quite yet to review.  But in any case, we do, we have been looking to Maricopa in that leadership role that I just described and which they have demonstrated.

Senator Kelly.  Rule 204 was submitted to the EPA, to Region 9, nearly three years ago.  They are still awaiting that response.  Do you think that response is coming soon?

Mr. Goffman.  I believe it is, and I have spoken to Region 9.  We are going to do whatever we need from the headquarters level to sort of surge the resources and get the review done.

Senator Kelly.  Are we talking a couple of months?

Mr. Goffman.  I hope so.  I can't say for sure.

Senator Kelly.  Can you check and get back to my office on that?

Mr. Goffman.  We will do that.

Senator Kelly.  Thank you.  I also understand that the county is continuing to have discussions with Region 9 on the other rule, 205, which would seek to generate additional credits from vehicle electrification.  Any status update you can give us on 205?

Mr. Goffman.  My understanding is that there are still information discussions but real discussions going on between Region 9 and Arizona and Maricopa County in sort of setting up the formal submission of that rule for approval.  But technically speaking, it is not in front of us, but we are working to kind of ease the path once the rule is submitted.

Senator Kelly.  Thank you.

Lastly, do you believe that the EPA has any statutory limitations within the Clean Air Act that make it difficult for the agency to identify non-industrial sources of emission reduction credits?

Mr. Goffman.  At a superficial level, I am afraid I will have to follow up to answer the question with all the nuance that my colleagues might counsel me to share.  I think we have a fair amount of latitude to identify emission reductions that can serve as offsets.  Again, I think Maricopa County's program using electrification to create offsets for economic development is an example of the range of what is approvable or permissible.

Senator Kelly.  Thank you.  I want to thank you for recognizing that Maricopa County has been a leader on coming up with some other options that uniquely address the situation out here in the west, specifically the State of Arizona.

Mr. Chairman, I am going to submit a few more questions for the record.  Thank you.

Senator Carper.  That would be great.  Thanks so much.

Senator Ricketts, welcome.  Welcome to the committee, all of our new members, welcome to the committee.

Senator Ricketts.  Thank you very much, Mr. Chairman.  Thank you, Mr. Goffman.  It is an honor to be on this committee.  I love to be on this committee, because I get to talk about ethanol.

[Laughter.]

Senator Ricketts.  I love talking about ethanol.

Senator Carper.  The Senator's time is expired.

[Laughter.]

Senator Carper.  Just kidding.

Senator Ricketts.  Ethanol saves consumers money at the pump, it helps clean up our environment, and it is great for creating jobs in America.  First of all, ethanol helps with gas prices.  Last summer, E15 users in some areas of this Country were able to save up to $1 a gallon.  I think the average was about 16 cents.  But last time I filled up with just E10 back in Nebraska, I think I was saving almost 50 cents a gallon on filling up my car.  So it saves consumers money.

Second, it reduces carbon emissions.  Blended ethanol fuels reduction reduced about 1 billion metric tons of carbon dioxide equivalent greenhouse gas emissions from 2008 to 2020.  The USDA data shows that ethanol reduces greenhouse gases by about 43 percent.

Third, ethanol is great for our families here in Nebraska.  Our 24 plants create about 1,400 jobs and boosts our State economy by about $4.5 billion.  That also rolls over to our farm families as well as all the ancillary jobs that are created.

In fact, one of the things I have heard from people to is, hey, I don't want to replace fuel for food, but actually the byproduct of ethanol is distillers grains, which goes to feed livestock, cattle, pigs, chickens, which then we consume for food.  So it actually doesn't take away from our food supply.

Actually, we did a test on E30 that the EPA allowed at the State level.  So we ran E30 in vehicles, State vehicles that were produced after 2001, and had phenomenal success with that, and potential for even more environmental cleanup and more cost savings.

Last year, the Biden Administration allowed E15 to be sold year-

round and Americans benefitted in the three ways I just outlined.  If confirmed, will you commit that the EPA will provide the required waivers so that E15 will be available throughout this upcoming summer driving season?

Mr. Goffman.  Senator Ricketts, thank you for that question, and for that overview of the benefit of ethanol.  I know that my boss, Administrator Regan, agrees with you and agrees that the RFS program should really be implemented to meet its objectives.

It turns out that the decision to grant the use of E15 over the course of the summer season under the Clean Air Act, that is a game-time decision.  That is to say, we look at the data right at the time we are making the decision before we make the decision.  So I don't have the authority under the Clean Air Act to commit on March 1st to a decision that won't really come if it comes at all until May 15th.

However, I hope you see that from the decision we made last year we are certainly open to and really focused on what is happening in the market, what is happening with supply and working within our own team and with DOE so that if and when we get to the point where we have to do what we did last summer, we will be in a position to do it again.

Senator Ricketts.  Thank you, I appreciate that.  Again, for consumers and creating confusion, when we have the on-again, off-again policies, so something that would be more permanent would be great as well.

Also, I am glad you mentioned the RFS.  I am concerned that the EPA's proposed Renewable Fuels Standard rule does not reflect the

actual market conditions, specifically when we are talking about renewable diesel.  The EPA proposed to keep the RFS biomass diesel requirements below 3 billion gallons in 2025.  However, more than 3.6 billion gallons of advanced biomass-based diesel was produced in 2022, and more than 5.9 billion gallons may be produced by 2025.

How do you reconcile that the industry is producing more, but it is not reflected in the RFS?

Mr. Goffman.  That is a really good question, and it is a question we are looking at directly.  Because we have gotten a lot of comments focusing on this question since the proposal.  We will be addressing it when we issue the final set rule in mid-June.

Senator Ricketts.  Great.  Thank you very much, Mr. Goffman.

Senator Carper.  I think Senator Wicker is next, and if nobody else shows up, we will yield to and recognize Senator Sullivan after that.

Senator Wicker.  Thank you very much.

Let's talk about the submission for enforcement of the National Ambient Air Quality Standards set by the EPA.  Mississippi worked with EPA to submit an approvable proposal for the eight-hour ozone requirement in September of 2019.  In February 2022, EPA proposed to disapprove our plan for Mississippi, also for Alabama and Tennessee.

According to Mississippi DEQ, EPA took this action based on incomplete modeling results.  In EPA's proposed disapproval, EPA claims that Mississippi has a significant impact on three monitoring sites in Texas, one in Dallas, which is some 361 miles west of the western boundary of Mississippi, and two in Houston, which is some 386

miles west of Mississippi on our western boundary.

As we know, weather moves from west to east in that section of the United States.  This is a preposterous claim, that a State of less than 3 million people would have on two major metropolitan areas, 386 miles away and 361 miles away.

Our meteorologists dispute this, and say that high ozone in those three monitoring areas is a result of atmospheric conditions in that area, which makes a lot more sense.  I am saying that under your leadership, EPA failed to work with Mississippi on implementation of the Good Neighbor provision in the Clean Air Act on ambient air quality standards.

Under the Clean Air Act, States are entitled to come up with their way of making this work.  We have done that.  The proposed Federal Implementation Plan which my State and several other States are about to have to abide by will toss that away and implement, seek to implement, Washington-based drastic unachievable nitrogen oxide emissions from power plants and other industrial sources, which we cannot do.

One of the most important tenets, I repeat, of the Clean Air Act, is the ability of States to regulate emissions in a way that makes sense for the State, as long as we can get there, and we can get there, we are entitled under the law to regulate emissions in the way that is best for us.  The proposed FIP violates this.

Given that EPA is working to finalize the FIP this month, how are you going to help us get around these impossible requirements?

Mr. Goffman.  Thanks, Senator Wicker, for the chance to address

that issue.  You are right, we are under a consent decree to finalize
the Good Neighbor Plan.  I know we received comments from Mississippi
about the questions you raised, and the dispute they have with the way
we do, the conclusions we came to vis-à-vis our air quality modeling.

The obligation that Congress created for States and then in turn
for EPA to ensure that upwind or out-of-State pollution doesn't blow
into a non-attainment area and prevent that area from improving its
air quality is one that the agency has been trying to tackle since the
late 1990s.

Senator Wicker.  Let me interject here, sir.  Doesn't it seem
preposterous to you that Mississippi would be considered upwind of
Houston, Texas, and upwind of Dallas, Texas, when everyone that ever
watches weather patterns knows that is absolutely preposterous?

Mr. Goffman.  The only way I can really answer that is by turning
to what we rely on, which is the science of air circulation and air
quality modeling.  The air quality modeling does tell us that --

Senator Wicker.  That Mississippi is upwind of Houston, Texas.

Mr. Goffman.  We see through the science of atmospheric
circulation that pollution from Mississippi at times affects the air
quality in locales in Texas.  We can't un-see it.

Senator Wicker.  I will ask you to respond on the record.  I am
over my time.  Do you concede that there is more than one way to
achieve this level of attainment?

Mr. Goffman.  Absolutely.  We try to build, we intend to build
flexibility into our Federal Implementation Plans for sources that end
up being affected by them.  You know, Senator, even after we put out a

Federal Implementation Plan, the State can always step in again and come in with a State Implementation Plan to replace the Federal Implementation Plan.

Senator Wicker.  Well, it seems you are about to impose on us an impossible requirement.  So I look forward to visiting with you, and thank you, Mr. Chairman, for your indulgence.

Senator Carper.  All right, thanks.

We have been joined by my favorite Marine, Senator Sullivan.  Welcome, good to see you.

Senator Sullivan.  Thank you, Chairman, Captain, thank you very much.

Mr. Goffman, thank you for being here again.  Third appearance in front of this committee for this position.  You really must want it.

Senator Carper.  In the worst way.

[Laughter.]

Senator Sullivan.  Well, no, I appreciate it, right?  These hearings are not easy and you go through a lot of questions, and you are hanging in there.

I am going to start where I left off last time.  I have this chart; I love to show this chart.  Can you see that chart?  Now, you might remember, I asked you about this chart in your last hearing.

By the way, the national media hates this chart, right?  What does this chart say?  From 2005 to 2020, the major economy in the world that reduced greenhouse gas emissions more than any other major economy in the world by far was the United States of America.  Yay, say it, be proud.

The national media hates it, because it goes against all climate change doom and gloom, we are against it.  Now, you might remember, I raised this.  So they fact checked the hell out of this chart, and guess what?  It is true.  Can't deny it.  Look at this.  Reductions of this percentage.  And of course, who is the polluter of the world by far?  The Chinese Communist Party, India, Iran, Russia, by the way, all the bad guys.  The good guys are here, reducing emissions.

Now, if you remember, when I asked you about this chart, you looked a little skeptical, you looked confused, you looked surprised by it, which surprised me, because you want to be in charge of air, you need to have this chart embedded in your head.  Okay?  When I asked you why do you think that happened, you actually said, I think it was maybe EPA regulations.  So remember my response to you?  What was it?

Mr. Goffman.  I remember our time together and you actually didn't just ask me a question, you tutored me.  I hope I pass the test this time.

Senator Sullivan.  Well, you are going to show if you need remedial education right now or if you pass the test.  So what do you think happened?  Did this have anything to do with EPA regs?  Come on, you know the answer.  If you say yes, you are going to fail.

Mr. Goffman.  Technology and the market is what I remember from the --

Senator Sullivan.  Okay, technology and the market and the market particularly where?

Mr. Goffman.  In the electricity sector, the oil and gas sector,

and particularly in States like Alaska.

Senator Sullivan.  Well, revolution and the production of natural gas.

Mr. Goffman.  George P. Mitchell, right?

Senator Sullivan.  Exactly.  Revolution and the production of natural gas right here, that is the answer for the most part.  It has nothing to do with EPA.  Private sector, technology, American innovation is literally helping keep the world clean.

So here is my question.  You, if you are confirmed, the EPA is going to have a lot of role, not just domestically but internationally.  John Kerry, who I think is the bane of America's existence on so many issues of security, by the way, he is a White House staffer, right?  He is not a secretary, he is not a Senator, he couldn't get confirmed in this body if it took 100 years.  He is out there internationally saying, well, we don't think countries should buy American LNG, telling countries -- do you think that is smart?

Do you think what John Kerry is up to is smart?  Assume what I said is correct.  I would love it if he came out and denied it, I didn't do that.  But trust me, I have talked to foreign governments.  He is out there cautioning the Japanese against buying American LNG, for God's sake, which would make the world cleaner.  This is all about clean-burning American natural gas.  That is it.  That is the answer.  Every media outlet in America has fact-checked this, and they are like, damn, he is right.

So should we be telling foreign governments not to buy clean-burning American LNG from Alaska and other places?  Come on, this is

easy.

Mr. Goffman.  I really don't think so, but I never have --

Senator Sullivan.  Isn't it?  Let me just give you another --
right now, the G7 group of seven countries, the G7 industrialized
democracies are looking at their next meetings.  I am hearing rumors
that John Kerry is trying to get in the G7 leaders' statements not to
buy American LNG.  Like, whose side is this guy on?  Do you think that
is a good idea?  You will have responsibility over this.  Is that a
good idea for the environment of the world?  Look at that chart.
Answer my question.

Mr. Goffman.  Personally, I don't think so.

Senator Sullivan.  A horrible idea.  It is a horrible idea based
on science.  The Democrats like to say, we are the part of science.
Great.  That is science.

So here is the commitment I need from you.  I am just four
minutes, four seconds over.  One question.  When you guys get, because
you do a lot of international work, any proposal from John Kerry or
the other climate zealots in this Administration, who don't know any
of the science, by the way, and they are trying to reduce the export
of American LNG, can you commit to me to weigh in it with the EPA and
say, that is a bad idea for the environment of the world, not to
mention national security, for God's sake?  Can you commit to me to do
that?  Assume that is going to happen.

Mr. Goffman.  Senator, I commit to you to carry out the
responsibilities of the Office of Air and Radiation.

Senator Sullivan.  You just said this was a bad idea.  Will you

commit to me to telling others, John Kerry and others, that this is a
bad idea?  You are going to be in charge of EPA's Air program.

Mr. Goffman.   The reason I am hesitating, Senator, is I have
never been, in my experience working in the Office of Air and
Radiation, that question has never come up as a Clean Air Act
question.  It is very hard for me to make a commitment based on
authority I don't have or that I am not familiar with having.   My
personal opinion is not what I am asked for.  I am asked to apply my
expertise under the Clean Air Act.  I don't expect in my current job
ever to be asked that question --

Senator Sullivan.  You are.  You are.

Mr. Goffman.  -- in my current capacity.

Senator Carper.  The Senator's time is expired.

Senator Sullivan.  Mr. Chairman, the witness --

Senator Carper.  The Senator's time is expired.

Senator Sullivan.  -- dodging my question.

Senator Carper.  The Senator's time is expired.  We are going to
have another round of questions.  I invite you to stay and participate
in that.  Your time is expired.

Senator Sullivan.  It would be good if you can answer my question
in the next round.  Don't dodge it.

Senator Carper.  I ask unanimous consent to submit for the record
data from the Smart Electric Power Alliance, an organization that
tracks power sector commitments to reduce emissions which shows that
today 75 percent of the U.S. customer accounts are served by a utility
that is committed to a 100 percent carbon reduction target or a

utility owned by a parent company that has a 100 percent carbon

reduction target.  I ask unanimous consent.  Without objection.

[The referenced information follows:]

Senator Carper.  Let me lead into my next question.  I want to build off some of the conversation raised earlier.  As the document I just submitted for the record states, 75 percent of Americans, not just Californians, are being served by a utility with a net-zero goal. It is also my understanding a big contributor of the California blackouts are because of extreme weather and extreme weather events like wildfires fueled by climate change.

Question: can you please talk with us, Mr. Goffman, about how our Clean Air Rules work?  That is one.  Can you please explain about how our Clean Air Rules work, and that many of our rules require EPA to look at the existing technology to help clean up pollution, not at one State's actions?  I will say that again.  Can you please talk about how our Clean Air Rules work, and that many of our rules require EPA to look at the existing technology to help clean up pollution, not at one State's actions?

Mr. Goffman.  Thanks for that question.  It is a fundamental question to what the Clean Air Act requires us to do and the limits of what the Clean Air Act authorizes us to do. The way Congress wrote the Clean Air Act directed EPA to look at available technology that is in use, and to identify that technology and it is technology that is in use as the basis for emissions standards.

The Act also requires us to take account of costs, economics, in some cases energy needs, in establishing standards, so that while we establish standards that apply on a national basis, we are also directed by the Clean Air Act and in many cases by the courts, to include sufficient latitude and flexibility for States or for

individual sources to meet those standards by any means that they identify that in the end effectuate the required emissions reductions consistent with either other policies if we are talking about States, or the business needs of individual sources if we are talking about individual sources.

Senator Carper.  Thank you.  EPA's mission is to protect public health and the environment.  However, protecting public health and the environment also protects and helps our economy to grow.

For example, the American Innovation in Manufacturing Act to phase down the super climate pollutants HFCs is expected to create 150,000 direct and indirect jobs and improve our Nation's trade imbalance and chemicals and equivalent by $12.5 billion.  Briefly describe some regulations that you have worked on where there are critical economic and public health benefits.

Mr. Goffman.  Thanks, that is another question I really appreciate being able to answer.  The American Innovation in Manufacturing Act is a good example that really crystallizes what much of our environmental policy accomplishes.  The AIM Act was both an environmental and climate policy, but it was also a policy that supported ongoing investment in innovative chemicals and the chemical industry, so that industry could continue to develop economically and play a leading role internationally.

So you can look at the AIM Act as both at the same time a climate and environmental policy and as an economic growth and innovation policy.  Any number of Clean Air Act regulations have proven to achieve the same thing.  They are designed both to achieve pollution

reduction, air quality improvement, and public health improvement on the one hand, while also stimulating technology innovation.  It more often than not leads to more efficient and economic operations of sources and businesses.

Senator Carper.  Thank you.

Senator Capito is next, if she wishes to be recognized.  I think she may be yielding.

Senator Capito.  Yes, in the interest of the vote being on, I will yield my questioning time.  I am going to want a question at the very end, but yield to Senator Ricketts and then Senator Sullivan.

Senator Carper.  Senator Ricketts, go ahead.

Senator Ricketts.  Great, thank you very much.

Mr. Goffman, I want to kind of build on what Senator Mullin was talking about earlier.  One of the things that concerns me as well is managing the ability to, as we talked about earlier, the demand for electric cars and power generation but also transmission lines is another big deal.  If we don't have transmission lines, it doesn't really matter.  If you look, for example, where a lot of wind energy potential in this Country is, it is in the middle part of the Country where the demand is going to be on the coast and so forth.

Then of course just making sure we have baseload power as well.  Actually two years ago in Nebraska, the amount of wind energy generated actually exceeded the amount of coal energy generated.  So we are heading in a direction for more renewable energy.

But it does raise a question about baseload and making sure that we have enough power to be able to provide to folks and not having the

rolling blackouts, which is something that, again, in my lifetime has not happened until very recently.

Can you talk about reliable energy and electricity and how it is important here, and how do you think about this when you are thinking about this critical need to develop environmental regulations that are impacting our electric utilities?  How does that play into when you are doing your modeling to make sure that we have proper power generation and proper baseload to be able to continue to provide the growing needs of this Country for electricity?

Mr. Goffman.  Thank you for asking that question.  As I said to Senator Capito, whenever we do power sector regulations, we look at cost impact on consumers and businesses and reliability with the same level of focus we do at the pollution reduction we are aiming to achieve.

I have never encountered a Clean Air Act provision that authorizes the agency to shut down sources.  In fact, as I was mentioning, we have that problem statement right in front of us as we are endeavoring to finalize the Good Neighbor Plan.  We proposed the Good Neighbor Plan and we got a lot of feedback from reliability entities saying that what you have proposed is going to put a burden on the very sources that we may need in order to ensure reliability.

So having been given that information by the experts in reliability, we are going to be addressing that challenge they put to us or the information they shared with us.  We are going to be addressing that in the final rule.

So, the reliability issue comes to us on a rule by rule basis.

Fortunately, the Clean Air Act, by design of Congress, the Clean Air Act authorizes us, even requires us to ensure that whenever we set standards and define compliance we include sufficient flexibility so that grid operators and generators can respond to the reliability needs of the grid.

Senator Ricketts. You made a comment about shutting down utilities. The EPA's regulations can have that effect, when you put on regulations, especially, we talked a little bit about State Implementation Plans versus the Federal Implementation Plans. The experience in my State was, some of the regulations can be so onerous that in effect, even though you are not shutting down the utility, that is what is going to happen. Then of course, with all the consequences that go along with that.

So are there specific models you are using when you are saying, hey, this is how much power generation is going to come offline for the potential impact, or are there models that say, wherever you are regulating, this rule will allow certain sources of utilities to be able to continue to provide electricity?

Mr. Goffman. We do modeling that predicts or projects, predict is an overstatement, projects shutdowns. But that is just the beginning of the inquiry when we see those results. We then consult with and engage with reliability or grid operators to get an assessment of whether those possible shutdowns will result in reliability problems.

I point you to rulemakings that the Office of Air and Radiation has done where we have added provisions to ensure that if in reality a

source is going to shut down or have to go offline to install

pollution controls in circumstances when doing so would threaten

reliability, we have added additional provisions to allow those

sources or those grid operators to avoid that.

I don't want to quite say it is case by case, but we work with

the particularities of each rule and each area of the Country that may

be affected by a rule that we have proposed and then work on

finalizing.

Senator Ricketts.  Thank you.

Senator Carper.  Thank you for those questions.

Senator Padilla, thanks for coming back.  I know you have been

here before.  Thanks for coming back.

Senator Padilla.  Thanks, Mr. Chairman.  Yes, there is Budget and

Judiciary also meeting this morning, so I am on my roller skates

today.

Senator Carper.  Yes.  There you go.

Senator Padilla.  Mr. Chairman, I understand that while I was out

of the room there were questions and concerns raised about the

reliability of the electrical grid in California, to put it mildly.

Senator Carper.  I think that did come up.

Senator Padilla.  I invite any of my colleagues who are

interested in learning more about how California is not only greening

our grid but minimizing the frequency and duration of blackouts when

they do occur, I am happy to lead a tour to the fourth largest economy

in the world.  Not just to brag on California, but in the interest in

bipartisanship, talk about some of the work that Senator Cornyn and I

did last session in response to not just concerns in California, but blackouts in Texas because of the winter storms they have had year after year.

Our Power On Act, which was introduced and incorporated into the Bipartisan Infrastructure Law, has us working with States and utilities to modernize the grid and minimize grid impact on people, their lives and the economy.

With that being said, Mr. Goffman, I want to thank you for your collaboration these past few years in addressing some of those pressing challenges facing California.  As you know, over 18 million people, nearly half of California's population, are breathing air that does not meet Federal health-based standards for ozone and particulate matter, non-attainment areas.  California is in jeopardy of Federal sanctions as a result, including the potential loss of highway funds if our air quality does not improve.

Having served in local government and State government in California, I can attest to California's aggressive actions to reduce or regulate the sources of pollution under State jurisdiction.  What is left to tackle is the pollution sources under Federal jurisdiction, such as pollution from goods movement, which especially impacts our most vulnerable populations living in environmental justice communities or those near ports and major transportation corridors.

I appreciate the EPA's efforts so far to reduce air pollution from some of the hardest-to-decarbonize transportation sectors including interstate heavy-duty trucks.  So yes, that is progress, but we can't stop there.  We have had this conversation.  We need EPA to

act with urgency on all of the above efforts to tackle the sources of California's continued air pollution.

I am particularly interested in how EPA plans to tackle mobile sources of pollution under Federal jurisdiction such as ocean-going vessels, locomotives and other heavy-duty sectors.  Mr. Goffman, does EPA plan to issue non-regulatory dockets to lay the groundwork for future regulatory action to address mobile sources?

Mr. Goffman.  Thanks for that question, Senator Padilla.  I hope you appreciate that we really do have the same priorities.  We have a lot of different initiatives in the works or already out and running.

I have mentioned before that we are starting to look at locomotives, for example, in two different ways.  One is to address directly State authority to impose requirements on locomotives.  The other is to start to lay the groundwork within our own shop to address perhaps an entry to Federal standards locomotive emissions.

Your question suggested that establishing a non-regulatory docket would be a tool we could use to start focusing on that issue, not just for the purposes of gathering information that we would need, but also for sending a signal or even creating a venue for engagement with the industry, so that we could make progress there.

As you probably know, the Administration recently put out a comprehensive transportation strategy focused on decarbonization across the entire universe of transportation.  Thanks to the Inflation Reduction Act, we are in the position to be able to initiate and deploy several grant programs that go directly to goods movement, either at ports or at other freight depots, and also through Clean Air

Act pollution reduction grants.

Senator Padilla.  I know my time is almost up, but just a quick follow-up question.  Is there a tentative timeline for subsequent action to just push it from locomotives specifically?

Senator Carper.  Just very briefly.

Mr. Goffman.  For the aspect of State authority, I think we have a proposal in the works that will include addressing that.

Senator Padilla.  Weeks?  Couple of months?

Mr. Goffman.  If I am thinking about the right proposal, it could be in a few weeks on the State authority side.

Senator Padilla.  Okay.

So in closing I just want to thank you for not just responding to these questions; we have been in regular contact.  I look forward to our continued collaboration and I want to say I look forward to EPA issuing California's outstanding waiver requests which are critical to address the very serious air quality challenges facing California that we have been discussing today.

Senator Carper.  Yes, thanks for the extra effort to come back and join us.

Senator Capito?

Senator Capito.  I am going to yield to Senator Sullivan and then I will wrap up.

Senator Carper.  Senator Sullivan.

Senator Sullivan.  Thank you.

I am going to return to where I was before, and you know, it is not my intention, Mr. Chairman, to get you upset.  I have a lot of

respect for you.  But these are actually really important issues.  And just in the break here, Administrator Regan is a G7 delegate.  They do an environment and minister statement leading up to the G7.

So the questions I am going to ask you are very relevant.  I have a lot of respect for you, but don't dodge my question, okay?  We just went through the science of what I was talking about.  Assume that what I am saying is correct.  You have people like John Kerry who are trying to make it harder or impossible to export clean-burning American LNG.  Not only is this good for our national security, but it is clearly good for the environment.

So assume the hypothetical that you get asked, Regan gets asked to sign a G7 environmental leader statement that would do something like that which would be against our national security, against the environment, against our economy.  What advice are you going to give him, given what you have said to me?  Don't dodge me.  In your personal opinion.  Don't tell me you don't have authority, you do, to be asked this question.

What is the answer?  You know what the answer is.  Give it to me in this hearing right now in front of the Senate confirmation.

Mr. Goffman.  Senator, I would rather plead guilty to dodging the question than answer a question that I don't feel qualified to answer right now.  This is an issue that I have not been briefed on by my expert staff.  If and when Administrator Regan asks me for his advice, of course I will give it to him.  But in my work, I am never asked hypothetical questions, and I don't really feel qualified to answer it.

Again, I will admit to you that, to use your words, I am not
answering or I am dodging the question, but I would rather, in a
Senate hearing, answer a question that I am qualified to answer, and
decline to answer questions I don't feel qualified to.

Senator Sullivan.  Okay.  Well, let me just say, this is a huge
issue, all right?  Because we have an Administration led by guys like
Kerry who are not Senate-confirmed, that guy could never get Senate-
confirmed, who are fundamentally focused on shutting down the
production of American energy.  And it makes no sense.  It makes no
sense for the environment, for the economy, for workers, for national
security.

Let me turn to a related question.  And this is where I do get
upset, Mr. Chairman, and I would love to have a damned hearing on it
some time.  My State, in the two years of the Biden Administration,
has suffered 44 Executive Orders or Executive Actions solely focused
on Alaska, 44.  There is no State in the Union that is getting this
kind of unwanted attention.  Forty-four, crushing the people who I
represent and their jobs.

So here is my simple ask of you.  We have gone to the White
House.  We have pleaded for a ceasefire on the war on Alaska's
economy.  I have asked for at a minimum with senior officials in this
administration at least give me a heads-up when you are going to screw
my State again.

So can I get that commitment from you, when you guys do a
singular rule focused on Alaska, maybe reach out to us.  I did this
with the Secretary of Agriculture, the big issue in the Tongass

National Forest.

You know how we learned about it, me, Senator Murkowski, Congresswoman Peltola, a Democrat?  In the Washington Post.  They briefed them for two weeks, never gave us one heads-up.  Can I get at least a commitment to the respect that I would imagine should come out of the EPA that if you are going to do another action, not 44 but 45 or 46, it is almost daily with these people, that you call me, call Senator Murkowski, call Democrat Congressman Peltola and go, hey, Senator, just a heads-up, we are getting ready to screw you again. Can you at least commit to that to me?

Mr. Goffman.  When the Office of Air and Radiation takes an action that is going to affect Alaska, I look forward to engaging with you and your colleagues.

Senator Sullivan.  Okay, thanks.  I have one final question.  It is a simple one.  It is not a simple one, it is just, the EPA is finally confronting a rule that Alaska has been a leader on since the 1970s, that is reducing methane emissions.  My State actually reinjects all our gas on the north Slope, 9 dcf a day, almost. Highest standards on the environment in the world by far.  Go look at a place like New Mexico that, drill baby drill, spewing emissions all over the place.

But here is my question.  EPA, however, with their new rule, is deputizing NGOs and other "third party audits" to do this kind of work.  This is State of Alaska DEC work.

So can you tell me how you are going to do that, say, on the North Slope of Alaska, with third-party NGOs?  Like who?  The Center

for Biological Diversity?  Who are you going to deputize?  This is an
EPA and a State of Alaska issue on methane emissions.  Can you explain
what they are trying to do on this new program that is outsourcing
government enforcement rules probably to NGOs that don't have my
State's interests in mind?

Senator Carper.  The Senator's time is expired.  Let me ask, we
are 30 minutes into a vote.  Thirty minutes they have been waiting for
us to come and vote on the Senate Floor.  You may not know that but
that is what is going on right now.

Senator Sullivan.  You are not going to let him answer that
question?

Senator Carper.  I am going to ask him to answer that question
for the record.

The other thing I am going to ask is, the way we do stuff in
Delaware is when we have differences of opinion like this, we actually
get together and talk about it.  If the two of you are not doing that,
please do, please do before we go through another hearing like this.

I am going to now go back to Senator Capito.  You are next in
line.

Senator Capito.  Thank you, Mr. Chair.

I have my own questions, but very quickly, first of all, on the
MATS Rule, which was $9.6 billion estimated per year.  When you were
in your prior time at the EPA, the Supreme Court stayed EPA's Clean
Power Plan and found that the EPA had not properly justified the MATS
Rule.

 So the EPA recently finalized and reinstated and the Chairman

was touting the results.  What people did was went ahead and did it and then found out it wasn't a firm foundation of which that rule was created.

You are using a very similar and overly broad interpretation of the statute again, we feel.  Do you think this broad interpretation of the statute will fare any better in the courts this time?

Mr. Goffman.  I believe the determination we made that it is appropriate and necessary to regulate mercury and other air toxics from the power sector is consistent with our legal authority.

Senator Capito.  I don't think that was the question.  I don't think that was the problem, though.  It was that you hadn't taken the full array of -- that is correct, right?

Mr. Goffman.  Of cost, yes.

Senator Capito.  Yes.

Mr. Goffman.  What the Supreme Court told us is that our interpretation of the statute, which was that we had to look at the mercury question without looking at cost, was wrong, and that we were not required to exclude cost, and that within the meaning of the statute, we needed to take account of cost.

Senator Capito.  I am going to go, because I know we need to vote.  But I would hope that, you can't just keep overly, overly picking and choosing what parts of the law that you have to take into consideration.  I think the Supreme Court has supported that policy, and that is why those two either got stayed or taken down.

One thing I would say as part of the discussion here on retirements of plants, of coal plants or natural gas, according to

PJM, those are policy-driven.  A lot of those, most power plant

retirements are policy-driven.  I just want to make that point.

Next point I wanted to make is first of all, I should have said

this in the beginning, green school buses are great.  We actually got

a Green Power, which is a manufacturer of green school buses, in our

State.  So I will say those 35 or so jobs are welcome in our State,

and we actually have just completed a pilot study in one of our

hillier regions on an electric bus and it was successful.  So good for

that.

Last question, on the Good Neighbor Plan, you have included other

sources besides what the original CSAPR plan, which was just the power

sector.  So you've got cement and cement production, iron and steel,

gas and glass products, chemical manufacturing, pulp and paper, paper

board, et cetera, et cetera.  We are hearing daily about supply chain

shortages, we are hearing about Buy America that is becoming

problematic.  That is in the IIJA and other kinds of things.

So with these bottlenecks, with this kind of onerous regulation

on a new sector, the industrial sector, and I asked you about this

before, how is this going to help with the domestic production of our

own domestic that we need for semiconductors, that we need for

everything that we want to build in this Country?

Mr. Goffman.  I hope you realize that that set of questions is

compelling to the Administration and to the agency as well.  Just a

few things.  The Federal courts have weighed in, including the Supreme

Court, several times about how to implement the Good Neighbor

provisions.  We are really doing our best to follow what the courts

have told us the boundaries of our legal authority and obligation are.

Second, we are focusing on requirements that are based on what sources in the same sectors are already using in some States to control NAAQS emissions.  Third, the question you raise has come to us in comments since we issued the Good Neighbor proposal, and we are focusing on ways to address those questions when we finalize the Good Neighbor proposal.

Senator Capito.  Good.  Like I said on the earlier response, time will tell on that.

Thank you very much.  I would say anecdotally if you have a provision that is directly going to affect just my State of West Virginia, I would expect you to come and tell me that in advance.  I don't think that is an unreasonable request from Senator Sullivan. Thank you.

Senator Carper.  Senator Capito, this has been an interesting confirmation hearing.  A little more exciting than some, but we covered a lot.  I want to again thank Mr. Goffman for joining us today.  He has been nominated, as we all know, for a critical role at EPA.  I am pleased we have been able to hear from you today.

I would like to ask unanimous consent to submit into the record a variety of materials related to today's hearing, including the over 50 letters of support for Mr. Goffman's nomination, along with articles and independent analyses related to this nomination.  I hear no objection.

[The referenced information follows:]

Senator Carper.  Senators are going to be allowed to submit
written questions for the record by 4:00 p.m. on Monday, March 6th.
We will compile those questions, submit them to you, Mr. Goffman, and
will ask you to reply by Monday, March 13th.

Before I adjourn the hearing I just have to say something.  I am
the last Vietnam veteran serving in the United States Senate.  One of
the people who served in southeast Asia in the Vietnam War at the same
time I did, I was in the P3 aircraft, mission commander, and we were
flying low-level missions off the coast of Vietnam and Cambodia to
interdict and infiltrate trawlers trying to come in and resupply the
Viet Cong.  We would track them into the coast and we would turn them
over, those trawlers, interdicting, we would turn them over to swift
boats.

One of those swift boat commanders was John Kerry, who was highly
decorated for his role and heroism in that war.  Later, along with
John McCain and I, the two of them led the effort in the Senate, along
with me and a group of bipartisan Congressmen, we worked with the
Vietnamese government and the Bush Administration, George Herbert
Walker Bush, to normalize relations with Vietnam.  We literally served
in a war with Vietnam and later on, years later, in a bipartisan way
for a Republican President, worked to normalize relations.

Today, Vietnam and the United States enjoy some of the closest
relations, not just trade relations, but actually defense-related
relations, standing up to China and their effort to expand their
influence in that part of the world.

For his efforts in the Vietnam War and I think for his service

here in the United States, when John Kerry was nominated to be

Secretary of State, he was actually confirmed.  He wasn't narrowly

confirmed, he was confirmed by a vote of 94 to 3 in 2013.

    With that, this hearing is adjourned.

    [Whereupon, at 12:11 p.m., the hearing was adjourned.]